[Crim. No. 284. Fifth Dist. Aug. 14, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. RAYMOND ROSS LAURSEN, Defendant and Appellant.

Robert L. Meadows and Merle H. Jenkins, under appointments by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Daniel J. Kremer and Peter G. DeMauro, Deputy Attorneys General, for Plaintiff and Respondent.

STONE, J.—A jury found defendant guilty of robbing Esther Harris, a cashier at the Giant Food Market in Fresno, at gunpoint, on October 14, 1964, approximately 9 a.m. He and his accomplice, Vincent Lowrie, obtained about $2,000. They arrived at the scene of the robbery in a 1955 Mercury automobile which they parked at the curb. After the robbery they ran to their car; it would not start; they ran to the parking area of a nearby furniture store and, at gunpoint, ordered Donald Teeter to drive them away in his Sprite automobile. Defendant said to Teeter, "I'll tell you where to drive."

Ralph Canales, an eyewitness to the arrival and departure of defendant and his accomplice, hailed a passing motorcycle

officer, Maurice Regan, and directed him to the parking area where the Sprite automobile was approaching an exit. Defendant, gun in hand, was sitting on the passenger side in the front seat, his head, shoulder and arm out of the window. As he pointed the gun toward the officer, Teeter attempted to wrench it away and was shot in the left hand. Officer Regan fired three or four shots at the car in an unsuccessful attempt to disable it.

Teeter drove north for about a mile and a half, where he was ordered to stop. Defendant got out of the car, walked to a service station and asked the proprietor, Mr. Bean, to summon a cab. While waiting some 15 minutes for a cab, defendant chatted with Mr. Bean, who noticed that he was carrying a paper bag which he still held when he left in the cab. That was the last seen of defendant until he was located in Kansas City and returned to Fresno for trial, after extradition proceedings. Meanwhile Teeter continued northward with Lowrie and at his order drove into an orchard where Lowrie bound Teeter and left him in a ditch.

Defendant was identified and located through a number of investigative procedures, all of which are questioned on this appeal. His fingerprints were ''lifted'' from the Mercury automobile, which bore Alabama license plates and was registered in his wife's name. He contends the search of the vehicle was illegal. His identity was discovered through aliases brought to light by a search and seizure of his belongings left in the home of Otis Graham, with whom he had been staying in Fresno. The search of the home and seizure of boxes and clothing are alleged to have violated his Fourth Amendment rights.

Various witnesses identified defendant as the person who committed the robbery and also as the person who stayed at the Graham home. Defendant questions the validity of the identification procedures and the substantiality of identification evidence.

 Defendant's final point is that misconduct by the district attorney so prejudiced the jury that a judicial admonition could not cure the error, and that such misconduct deprived him of a fair trial. For reasons discussed below, we conclude this point is valid and requires a reversal; hence we discuss the last point first.

In his opening statement the district attorney told the jury:

''A statement was taken from Mr. Lowrie and Mr. ie

confessed to the crime. He indicated primarily that he had come to town a few days before. He had worked in the carnivals and that while here in Fresno, he had met a person that he knew as Eddie and Eddie was the person that committed this crime with him, the person whose name is Eddie, in fact, he had seen his driver's license once and the name on this driver's license was Edwin Pierce.

"The evidence will show that Edwin Pierce is an alias of this Defendant. He has admitted in a prior hearing that he has used the name Edward Pierce and that Mr. Lowrie saw the name *Edward* Pierce on the driver's license of Mr. Laursen and that he and Mr. Laursen were both carnival workers, that they had been drinking in bars for several nights and Mr. Lowrie said he is an ex-convict, having been convicted of three prior felonies. Mr. Lowrie has indicated that—you know a convict or person of this type when you see one—and that they, Mr. Lowrie and Mr. Laursen had talked about this robbery on the day before.

"Mr. Lowrie indicated that they had gone to this Giant Food Center—Giant Food Market on the day before. They had checked out the place. Mr. Lowrie had gone in, Mr. Laursen had remained in the car and that they had agreed to hold the place up the next morning and that according to plan, Mr. Lowrie and Mr. Laursen then proceeded to the Giant Food Market the next morning and had held it up according to plan.

"Mr. Lowrie did plead guilty and is presently serving a term in San Quentin Prison."

Lowrie, although available, was not called to the witness stand, was never questioned under oath nor subjected to cross-examination.

Defendant asserts that since *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], was decided three and a half months before this case was tried, the district attorney is charged with knowledge that it is impermissible to relate the confession of an accomplice to the jury. Therefore, he argues, it is clear the district attorney's use of Lowrie's confession was deliberate and an intentional violation of the Supreme Court edict.

The quoted part of the opening statement goes even beyond the practice condemned in *Aranda.* The extrajudicial statement of an accomplice, implicating a codefendant, was admissible in a pre-*Aranda* joint trial only when accompanied by the court's admonition that the jury disregard any reference

in the statement to the codefendant. Here, the accomplice was not on trial; his confession was inadmissible hearsay which it was error to relate to the jury, quite aside from *Aranda,* although that case emphasizes the grossness of the misconduct.

■ Certainly a district attorney can advise a jury that he intends to call an accomplice as a witness and relate what he expects the witness to say, but he cannot relate a confession of an accomplice, qua confession.

■ In addition to implicating defendant in the crime by hearsay evidence, the district attorney improperly got before the jury, by innuendo, that defendant was an ex-convict. He did this by reciting part of Lowrie's confession that he was an ex-convict and therefore he could tell another ex-convict when he saw one, referring to defendant. The district attorney said: ''Mr. Lowrie said he is an ex-convict, having been convicted of three prior felonies. Mr. Lowrie has indicated that—you know a convict or person of this type when you see one—and that they, Mr. Lowrie and Mr. Laursen had talked about this robbery on the day before.''

■ Evidence that a defendant has been convicted of a crime or has committed other crimes cannot be used to prove his criminal disposition or continual criminality. (*People* v. *Kelley,* 66 Cal.2d 232, 238 [57 Cal.Rptr. 363, 424 P.2d 947].)

■ Here, defendant was not accused of any specific crime, only that Lowrie recognized him as an ex-convict, which was improper.

The People argue there was no error because the district attorney advised the jury at the outset that what he was going to say was not evidence but only a summary of the evidence he intended to present. The matrix of *Aranda* is that jurors are unable to comply with an admonition to disregard information revealed through inadmissible evidence even when such admonition comes from the judge and is directed at specific evidence at the moment it comes in. This same aspect of human fallibility bears upon the People's additional contention that prejudicial misconduct cannot be raised on appeal when, as here, defense counsel fails to object to the remarks during the trial.

*People* v. *Perez,* 58 Cal.2d 229, 247 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946], makes an exception to the rule that where prejudicial error occurring during trial is of such character that a harmful result cannot be obviated or cured by a retraction by counsel or instruction by the court, the issue of prejudice may be considered on appeal. (See *People* v.

*Reese,* 220 Cal.App.2d 143, 147 [33 Cal.Rptr. 561].) A number of noted jurists have commented upon the futility of admonishing a jury of laymen to erase from their minds the effect of persuasive but inadmissible evidence of guilt.[1]

We conclude that the statements by the prosecuting attorney were of such character that their harmful effect could not have been obviated or cured by an instruction by the court or a retraction by counsel.

▪ The People also argue that a showing of bad faith is lacking. The district attorney had Lowrie brought from prison to court for the trial, but he did not have him testify; nor did defendant call Lowrie as his witness. Yet after telling the jury in his opening statement what he intended to prove by Lowrie, the district attorney said to the jury in closing argument:

"Furthermore, there may be some question, and I want you to consider this very carefully, as to why Mr. Vincent Roosevelt Lowrie did not get on the stand and testify. I think it is very obvious to the jury why the People could not call him.

"Mr. Lowrie is a partner in crime of this Defendant. He is serving a term in San Quentin and you can imagine the term he is serving for kidnapping and for armed robbery. You can imagine the term that he is serving.

"Now, would the People call such a witness? But why didn't the Defendant call him if he was innocent? Why didn't the Defendant call him? The People are quite surprised he was not called. It is very obvious why the People didn't call him, he doesn't want to get a San Quentin blade in his throat after this trial."

By these closing remarks the district attorney compounded

---

[1] In *People* v. *Aranda,* 63 Cal.2d 518, 529 [47 Cal.Rptr. 353, 407 P.2d 265], Chief Justice Traynor, speaking for the court, pointed out the unrealistic sophistry inherent in the notion that a juror could adhere to an admonition that he disregard parts of a confession of one defendant in determining the fate of a codefendant.

The United States Supreme Court said, in *Jackson* v. *Denno,* 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205]: " 'The government should not have the windfall of having the jury be influenced by evidence against the defendant which, as a matter of law, they should not consider but which they cannot put out of their minds.' " Mr. Justice Jackson, in his concurring opinion in *Krulewitch* v. *United States,* 336 U.S. 440, 453 [93 L.Ed. 790, 799, 69 S.Ct. 716], said: "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." Judge Hand said: The limiting instruction is a "recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else." (*Nash* v. *United States* (2d Cir.) 54 F.2d 1006, 1007.)

the error of his opening statement, and evidenced bad faith by blaming defendant for Lowrie's failure to take the stand and relate the substance of his alleged confession as the district attorney had said he would do. We also note the prosecuting attorney's statement that Lowrie was afraid to testify is not substantiated; it is simply a surmise on the part of the prosecuting attorney, unsupported by the evidence.

The prosecuting attorney also erred in commenting upon the failure of defendant's wife to testify on his behalf. (*People* v. *Wilkes*, 44 Cal.2d 679, 687 [284 P.2d 481]; *People* v. *Klor*, 32 Cal.2d 658, 663 [197 P.2d 705]; see Evid. Code, §§ 970, 971.)

We now consider the procedural questions raised by defendant, in the event they arise upon a retrial. (Code Civ. Proc., § 43.) ■■■ At the outset, we note that the various searches to which defendant objects were conducted without a search warrant, so the burden falls upon the prosecution to justify each of them. (*People* v. *Marshall*, 69 Cal.2d 51, 56 [69 Cal.Rptr. 585, 442 P.2d 665]; *People* v. *Burke*, 61 Cal.2d 575, 578 [39 Cal.Rptr. 531, 394 P.2d 67].)

■■■ The Mercury automobile was searched twice, first on the street and later when it was impounded. The first search was made when the officers were in hot pursuit of the robbers and needed to learn their identity. They had driven the vehicle to the place of the robbery and tried to leave in it, but were thwarted when it failed to start. One would be hard put to think of a better example of intelligent and efficient police work during hot pursuit of an escaping criminal than to search a stalled getaway automobile. Under these circumstances, the fact that defendant was away from the car at the time of the search does not, of itself, make the search illegal. It is said, in *People* v. *Williams*, 67 Cal.2d 226, 229 [60 Cal.Rptr. 472, 430 P.2d 30]: "A defendant's absence from the scene does not of itself render illegal a search which, in view of the totality of surrounding circumstances, is reasonable.

The second search was justified upon the ground the car had been impounded as a vehicle abandoned on a public street. When all of the facts known to the officers are considered, it is apparent they had good reason to believe the car was abandoned and to impound it. The robbers left the vehicle when it would not start; they commandeered another car at gunpoint; they left the scene amid an exchange of gunfire with Officer Regan and, of course, they never returned to the

vehicle. Upon impounding the car, the officers discovered there was no registration certificate. They later traced the owner through the Alabama license plates and learned that the car belonged to defendant's wife, whom they were unable to locate. In the meantime, the officers quite properly searched the car and itemized its contents for the protection of the owner, the garageman and the police. (See *People* v. *Garcia*, 214 Cal. App.2d 681, 684 [29 Cal.Rptr. 609] ; *People* v. *Ortiz*, 147 Cal. App.2d 248, 251 [305 P.2d 145].)

Thus we conclude that the cursory search at the scene of the robbery and the later, more thorough search after impoundment were justified, although made without benefit of a search warrant. (*People* v. *Webb*, 66 Cal.2d 107, 118 [56 Cal. Rptr. 902, 424 P.2d 342, 19 A.L.R.3d 708].)

We turn to the contention that the search of the Graham house was illegal and therefore the products of the search, which established defendant's identity and led to his apprehension, were tainted fruit of a "poisonous tree." (*Wong Sun* v. *United States*, 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407] ; *People* v. *Bilderbach*, 62 Cal.2d 757 [44 Cal.Rptr. 313, 401 P.2d 921].) The search came about when the police department was informed by the sheriff's office that Lowrie had been living in the Graham home and was wanted for investigation of an earlier crime. The officers went to the home of Otis Graham, who consented to a search of the house. Graham and Elsie Bratton, his girl friend, voluntarily told the officers that a man known as Ed or Eddie Pierce, who later turned out to be defendant, had stayed with Lowrie some four or five days prior to the robbery. They took the officers to the bedroom the two men had occupied. There were four cartons in the middle of the floor, the largest of which was open and contained what appeared to be clothing. Mrs. Bratton said the clothing hanging in an open-door closet also belonged to the two men. With the consent of Graham and Mrs. Bratton, the officers took the boxes and the clothing. It was from this material the officers learned that defendant used the aliases "E. Pierce," "David Lee Rose," or "R. L. Stankevich."

Defendant argues, first, that although Otis Graham and Elsie Bratton consented to the search, their consent was coerced because Graham himself was suspected of being an accomplice. This contention is based upon assistance given defendant by Graham and Mrs. Bratton in driving him to Bakersfield, where he boarded a Greyhound bus the night after the robbery was committed. But this fact could not have

been utilized by the police to coerce consent from Graham and Mrs. Bratton because the police did not learn about it until the day after the search. Even so, consent to a search is not necessarily coerced simply because the subject of an investigation is suspected of having participated in a crime, or is even under arrest at the time; it must be shown that this fact, at least in part, induced the consent. (*People* v. *Smith,* 63 Cal.2d 779, 798 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Guyette,* 231 Cal.App.2d 460, 465 [41 Cal.Rptr. 875]; *People* v. *Robertson,* 240 Cal.App.2d 99, 104 [49 Cal.Rptr. 345].)

 The record reflects no evidence from which it can be inferred that either Graham or Mrs. Bratton considered themselves suspects or, more important, that the officers thought they were suspects; all of the evidence points to a consent knowingly and freely given.

Defendant's bald statement that Graham's consent was coerced because of a pending drunk driving charge is negated by the record; Graham's arrest occurred after the search was made, in fact, after defendant's arrest.

Defendant argues, further, that even though the officers gained entrance to the house through a valid consent, they had no right to seize his clothing and effects without a warrant. The property was abandoned by defendant when he fled the state. Graham and Mrs. Bratton, who had lawful possession of the house, including the room, had exclusive right to possession of the abandoned property; consequently they had authority to consent to a search of it. (*Abel* v. *United States,* 362 U.S. 217 [4 L.Ed.2d 668, 80 S.Ct. 683]; *People* v. *Crayton,* 174 Cal.App.2d 267, 269 [344 P.2d 627]; *People* v. *Thomsen,* 239 Cal.App.2d 84, 89 [48 Cal.Rptr. 455].)

 Defendant complains of the identification procedures, which he asserts violated due process. His most hopeful approach, that his counsel was not present at the time he was placed in a lineup, is based upon decisions which are not applicable. The leading cases, *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], were decided after defendant had been identified and as those cases are applied prospectively (*People* v. *Feggans,* 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21]) they do not compel a reversal. On the other hand, defendant is entitled to relief if he can show that the lineup was "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." (*Stovall* v.

*Denno,* 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967, 1972]; *People* v. *Harris,* 67 Cal.2d 866, 872 [64 Cal. Rptr. 313, 434 P.2d 609].)

Defendant's principal criticism of the identification procedure is that all other men used in the lineup were police officers, although they were dressed in ordinary street clothing as he was. It is argued that undoubtedly the witnesses had seen one or more of the officers prior to the lineup, which would concentrate attention on defendant. In these circumstances, to overcome a claim of unfairness in the lineup procedure, the People bear the burden of showing by "clear and convincing evidence that the in-court identifications were based upon the observations of the suspect other than the lineup identification." (*United States* v. *Wade, supra,* 388 U.S. at p. 240 [18 L.Ed.2d at p. 1164].) From the *Wade* case we learn that: ". . . the proper test to be applied in these situations is that quoted in *Wong Sun* v. *United States,* 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407, 417], ' "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence on Guilt, 221 (1959).' See also *Hoffa* v. *United States,* 385 U.S. 293, 309 [17 L.Ed.2d 374, 386, 87 S.Ct. 408]. Application of this test in the present context requires consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup." (Pp. 241-242 [18 L.Ed.2d at pp. 1165-1166].) (Cf. *People* v. *Caruso,* 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336].)

With these criteria in mind we turn to the testimony of the eyewitnesses who identified defendant at the trial. The store clerk, Mrs. Harris, had no trouble making a positive identification of defendant as one of the two men who robbed her. In the first place, there is nothing to indicate that she knew any of the four police officers in the lineup, or that she had ever seen them before. But the critical fact is her testimony that

she identified defendant from her observation of him as he entered the store, when he entered her check stand and showed her a gun and told her to put the money in a paper bag, and finally, when defendant stood by the safe, facing her, as the manager tried unsuccessfully to open it. She testified that at that time, ''I thought to myself, 'Well, you had better see if you can remember what they look like because they will be asking you later on.' '' Moreover, Mrs. Harris' identification of defendant aside from the lineup is substantiated by the description she gave the police immediately after the robbery, which proved to be extremely accurate.

The kidnap victim, Donald Teeter, also gave police a description of defendant from his memory of occurrences long before the lineup. It was certainly normal for Teeter to remember the man who kidnaped him, shot him through the hand during a scuffle for the gun at the beginning of the kidnap ride, and directed his driving.

Officer Regan explained that his ability to identify defendant was based upon his memory of the man who shot at him. He testified: ''Q. Are you comparing that photograph with this gentleman?

''A. I am comparing the photograph with the impression that I have had burned in my mind that, as I say, that was a situation that I will never forget.''

Nor does there appear to be any reasonable criticism of the identification by the eyewitness, Canales, who directed Officer Regan toward the escaping defendant, or by Mr. Bean, the service station proprietor who talked with defendant while he waited for a taxi, holding the paper bag taken from the store. Having in mind that defendant's alibi was that he was not in Fresno at the time, it is significant that no attack has been made upon the Graham and Bratton identification of defendant as the man who, with Lowrie, lived in their home up to the day the crime was committed.

In the face of the positive identification of defendant by several eyewitnesses, completely apart from the lineup, we conclude there is no reasonable possibility that the manner in which the police conducted the lineup contributed to the guilty verdict. (*Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

█ Defendant criticizes the practice of showing so-called ''mug shots'' or police photographs of known criminals to witnesses in an attempt to identify the perpetrator of a particular crime. One of the most common and effective ways of

ferreting out possible suspects is by showing witnesses to a crime the pictures of those whom the police have reason to believe might be involved. The propriety of this investigatory procedure is discussed in *Simmons* v. *United States*, 390 U.S. 377. [19 L.Ed.2d 1247, 88 S.Ct. 967]. The Supreme Court first recognizes that the use of photographs for identification can, if not properly used, result in misidentification, but concludes: ''We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'' (P. 971 [390 U.S. at p. 384, 19 L.Ed.2d p. 1253].)

Not only has defendant failed to establish a misuse of photographs, but the positive ''in court'' identification by Mrs. Harris, Mr. Teeter, and Officer Regan, based upon their observations of defendant at the scene of the crime, rules out any possibility of misidentification.

 Defendant contends the trial judge committed error by instructing the jury that a kidnaping in the course of a robbery or with intent to commit robbery can occur after the actual taking of the property; that is, the kidnaping can take place during escape or while evading pursuit or apprehension. Defendant appears to argue that in the light of the 1951 amendments to section 209 of the Penal Code, the kidnaping must precede the robbery. This is a misconstruction of the code section. *People* v. *Martin*, 250 Cal.App.2d 263, considers this proposition, at pages 268-269 [58 Cal.Rptr. 481]: ''Where, as here, kidnaping occurs *after* the actual perpetration of a robbery 'such kidnaping may be kidnaping for the purpose of robbery if it may reasonably be inferred that the transportation of the victim was to effect the escape of the robber or to remove the victim to another place where he might less easily sound an alarm. [Citations.]' '' (See also *People* v. *Monk*, 56 Cal.2d 288, 295 [14 Cal.Rptr. 633, 363 P.2d 865]; *People* v. *Kristy*, 4 Cal.2d 504, 507-508 [50 P.2d 798]; *People* v. *Randazzo*, 132 Cal.App.2d 20, 23-24 [281 P.2d 289].)

 Defendant also questions the admissibility of the fingerprints upon the ground custody of them was not ac-

counted for from the time they were lifted from the Mercury automobile until trial. We have examined the record, and the contention is without merit. The testimony concerning the lifting of the fingerprints, comparison of them with defendant's fingerprints, and the method and manner by which the police department preserved the evidence complies with decisional requirements for their admission in evidence. (See *People* v. *Riser,* 47 Cal.2d 566, 580-581 [305 P.2d 1] (overruled on another point in *People* v. *Morse,* 60 Cal.2d 631 [36 Cal. Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]).)

The record does not support defendant's assertion that he was handcuffed or otherwise restrained in the presence of the jury. If he was manacled during the trial, he should have sought to have them removed, or made a motion or objection for the record, since it is settled that facts outside the record may not be considered on appeal. (*People* v. *Parriera,* 237 Cal.App.2d 275, 286 [46 Cal.Rptr. 835].)

The argument is made that the court erred in receiving in evidence an excerpt from testimony given by the defendant in a habeas corpus proceeding initiated by him in a Kansas court while awaiting extradition to California. The testimony was received as an admission for the purpose of establishing the various aliases used by defendant, and runs to the question of identity.

It would seem, at first blush, that an admission made in open court in a prior judicial proceeding would be admissible under the established rules of evidence. However, a more discriminating analysis is required, as the United States Supreme Court recently held, in *Simmons* v. *United States, supra,* 88 S.Ct. 967, that testimony of a defendant in support of his motion to suppress evidence in a pretrial hearing predicated upon an alleged unreasonable search and seizure could not be used against him in the trial of the case. To hold otherwise, said the court, would be to force the defendant to forfeit either his right to remain silent under the Fifth Amendment or give up his right to assert protection under the Fourth Amendment which, in the *Simmons* case, he could present only by testifying as to his ownership of the property alleged to have been wrongfully seized. Here, however, defendant was not asserting a constitutional right at the time of the habeas corpus proceeding in resistance to extradition; he was asserting the defense of mistaken identity, or alibi, in an effort to prove he was in Kansas City when the crime was committed. It is urged that to use this evidence against him

violated his right under the Fifth Amendment against self-incrimination, since he did not testify at the trial. However, the habeas corpus hearing was not a pretrial proceeding to determine the admissibility of evidence, and it was not initiated by defendant to assert the violation of a constitutional right. Therefore, absent a constitutional question pertinent to his trial, the admission made knowingly and voluntarily and while represented by counsel, was properly received in evidence. (See *Heller* v. *United States*, 57 F.2d 627; *Simmons* v. *United States, supra,* 390 U.S. at p. 394 [19 L.Ed.2d at p. 1259, 88 S.Ct. at p. 976].)

The judgment is reversed.

Conley, P. J., and Gargano, J., concurred.