[Crim. No. 16246. In Bank. Oct. 20, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND ROSS LAURSEN, Defendant and Appellant.

194

■■■■■■■■■■■■■■■

**COUNSEL**

Roger S. Hanson, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Marjory Winston Parker, James D. Garbolino, Jack R. Winkler, Craig Stalker and Edward W. Bergtholdt, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WRIGHT, C. J.**—Defendant Raymond Ross Laursen appeals from a judgment entered on jury verdicts convicting him of armed robbery (Pen. Code, §§ 211, 211a) and kidnaping for the purpose of robbery (Pen. Code, § 209).[1] The penalty for kidnaping was fixed at life imprisonment with

---

[1] All statutory references are to sections of the Penal Code unless otherwise specified.

possibility of parole.[2] The principal issue presented is whether a kidnaping committed while in the act of escaping from the site of a robbery falls within the meaning of "kidnaping for the purpose of robbery" as proscribed by section 209. For reasons which will appear we conclude that it does.

On the morning of October 14, 1964, shortly after 9 o'clock, defendant and Vincent Roosevelt Lowrie committed a robbery at a food market in Fresno. They drove to the scene of the robbery in a 1955 Mercury sedan which was registered to defendant's wife and which bore Alabama license plates. Defendant parked the vehicle on a side street where it could not be observed by persons from within the market. Upon entering the market, he drew a handgun and ordered the clerk at one of the check stands to empty into a paper grocery sack all the money in the cash registers. Lowrie, meanwhile, located the manager at the rear of the business establishment and forced him to the front where defendant was waiting. Following an unsuccessful attempt to compel the manager to open a safe, the robbers fled.

Defendant and Lowrie rushed out the front exit of the market, rounded the corner and hastily entered the Mercury parked a few feet away. Unable to start the motor, they promptly left the stalled car in search of substitute transportation. Defendant ran to a parking lot behind a furniture store across the side street while Lowrie searched elsewhere. A bystander, who saw the gun in defendant's hand and suspected that a robbery was in progress, flagged down a passing motorcycle patrolman, Maurice Regan, and the officer immediately started to pursue the fleeing suspects. By this time defendant and Lowrie had captured Donald Teeter in the furniture store parking lot. They entered Teeter's vehicle and ordered him at gunpoint to drive them to a place of safety. As the vehicle sped toward the exit of the parking lot, Regan approached on his motorcycle. Defendant, sitting in front on the passenger side of the commandeered automobile and leaning from the window, attempted to shoot at the patrolman. Before defendant could fire his weapon, Teeter grabbed defendant's arm, the car slammed to a halt and stalled and a struggle between Teeter and defendant ensued during the course of which Teeter was shot in the hand. Regan abandoned his motorcycle and took refuge behind a

---

[2] Although the jury found defendant guilty of the section 209 violation "with substantial bodily harm" as charged, the trial court amended such finding to provide that the violation was "without substantial bodily harm." The amendment is not challenged on appeal. (See § 209 requiring imposition of a penalty of either death or life imprisonment without possibility of parole for a kidnaping with bodily harm.)

This is the second time defendant has been convicted of the charged violations. The first judgment was reversed on appeal upon the ground of prejudicial misconduct by the prosecuting attorney. (*People* v. *Laursen* (1968) 264 Cal.App.2d 932 [71 Cal.Rptr. 71].)

parked automobile. Teeter was thereafter subdued by his captors and forced to drive the vehicle from the lot. Regan fired five or six rounds from his service revolver into the escaping automobile but without effect.

After Teeter drove a distance of about one-and-a-half miles, he was ordered by defendant to stop. Taking the grocery sack containing the money with him defendant alighted from the vehicle, walked to a nearby service station and called a taxicab. Teeter then drove Lowrie to an orchard a few blocks away where the former was bound and the latter drove off in the car.

Immediately after the unsuccessful attempt by Regan to capture defendant and Lowrie other officers arrived at the site of the robbery. They were told by eyewitnesses that the suspects had first attempted to make their escape in the Mercury automobile. The officers searched the passenger compartment of the Mercury but were unable to open the trunk. While they were involved with the search and before procuring appropriate tools to force the trunk, they received radio information that Lowrie had been taken into custody. Without completing their search they hurried to the place where Lowrie had been apprehended, hoping that they might locate and arrest defendant as well.[3]

By midafternoon the investigating officers discontinued their immediate efforts to locate defendant and resumed their search of the Mercury for additional clues. Without obtaining a search warrant, the officers went to the impound garage to which the car had been removed and opened the rear trunk. Inside they discovered papers and documents with the names Eddie Pierce, Edwin Cash Pierce and David Lee Rose, all aliases previously used by defendant. The information thus discovered not only led to defendant's arrest in Kansas and his return following extradition proceedings, but was also received in evidence at trial as tending to prove that defendant had been at the scene of the crime on the date it was committed.

We first address ourselves to defendant's principal contention that his conduct did not constitute a violation of section 209.[4] The argument

---

[3]Defendant, it appeared, had taken a taxi to the residence of Otis Graham where he, under the pseudonym of Eddie Pierce, and Lowrie had been sharing a room for several days. By nightfall, defendant began a journey which took him out of the state.

[4]Section 209 provides in pertinent part: "Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from relatives or

proceeds on either one or both of two related theories: (1), that inasmuch as the *intent* to kidnap Teeter was not formulated until after the commencement of the robbery, the kidnaping was merely an afterthought and, hence, not conduct proscribed by the provisions of section 209; and (2), that the *asportation* of Teeter was unrelated to the robbery since it occurred after that crime had been completed.[5]

As amended in 1951, section 209 makes punishable every person, inter alios, "who kidnaps or carries away any individual to commit robbery. . . ." In *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677], we held "that the intent of the Legislature in amending Penal Code section 209 in 1951 was to exclude from its reach not only 'standstill' robberies [citation omitted] but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (*Id.* at p. 1139.) Thus, the primary purpose of the statute is to impose harsher criminal sanctions to deter the carrying away of persons during the commission of a robbery in a manner which substantially increases the risk that someone will suffer grave bodily or psychic injury or even death.

In accordance with the foregoing purpose, we have enunciated the rule that a kidnaping in which a robbery occurs does not constitute kidnaping for the purpose of robbery unless the specific intention to rob is present at the time of the original asportation. (*People* v. *Tribble* (1971) 4 Cal.3d 826 [94 Cal.Rptr. 613, 484 P.2d 589].) In *Tribble,* it was reasoned that a defendant who kidnaped a woman at an airport, drove her to an isolated place nearby, raped her and subsequently robbed her, "was entitled to have the jury determine whether he intended to commit robbery at the time the kidnaping commenced or whether the intent to commit robbery was an afterthought to a kidnaping that was sexually motivated." (*Id.* at p. 832.)

---

friends of such person any money or valuable thing, *or any person who kidnaps or carries away any individual to commit robbery,* or any person who aids or abets any such act, is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm or shall be punished by imprisonment in the state prison for life with possibility of parole in cases where such person or persons do not suffer bodily harm." (Italics added.)

[5]Defendant was not charged with robbing Teeter of his vehicle. Therefore, only the robbery at the market could properly be the subject of the conviction under section 209.

Contrary to defendant's contentions, we have never held that section 209 requires that the separately defined crimes of robbery and kidnaping be tied together by a coexistence of the elements of intent at the commencement of the criminal transaction; or, to state it in a different fashion, that kidnaping, as well as robbery, must be simultaneously premeditated as a part of a single course of criminal conduct. Such a conclusion does not follow from the reasoning of *Tribble*. Since a robbery committed as an afterthought to a kidnaping generally does not substantially increase the risk that someone will be injured or killed such conduct may not be proscribed by the provisions of section 209. On the other hand, the carrying away of the victim or some other individual during the commission of a robbery, even though motivated by events occurring after the commencement of a robbery still in progress, most certainly increases the risk that he will be injured or killed and is specifically the type of conduct made punishable by section 209. The soundness of such a conclusion, in the context of the instant circumstances, becomes painfully evident. Fortuitously snatched as a hostage, Teeter was, as might reasonably be expected, wounded in the gun battle which occurred during the robbery, notwithstanding the fact that the kidnaping clearly was not premeditated at the commencement of the robbery. ■ In sum, we are of the view that where a kidnaping is in furtherance of a robbery during which the kidnaping occurs, a violation of section 209 is committed even though the intent to kidnap was formulated after the robbery commenced.

■ Turning now to the second theory which defendant urges in support of his contention that his conduct did not constitute a violation of section 209, we are confronted by his claim that the kidnaping and the robbery are separate, divisible crimes because the kidnaping was not committed until after the robbery, that is, the taking of the money, had been accomplished. Since an intent to kidnap for the purpose of robbery necessarily implies that the robbery is in progress when the intent to kidnap is formed, this argument must be considered.

This court has consistently recognized that "[r]obbery . . . is not confined to a fixed *locus,* but is frequently spread over a considerable distance and varying periods of time." (*People* v. *Boss* (1930) 210 Cal. 245, 251 [290 P. 881]; see also *People* v. *Salas* (1972) 7 Cal.3d 812, at p. 822 [103 Cal.Rptr. 431, 500 P.2d 7]; *People* v. *Anderson* (1966) 64 Cal.2d 633, 638 [51 Cal.Rptr. 238, 414 P.2d 366]; *People* v. *Ketchel* (1963) 59 Cal. 2d 503, 523 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Kendrick* (1961) 56 Cal.2d 71, 90 [14 Cal.Rptr. 13, 363 P.2d 13]; *People* v. *Kristy* (1935) 4 Cal.2d 504, 507 [50 P.2d 798]; *People* v. *Dowell* (1928) 204 Cal. 109, 117-118 [266 P. 807].) The assault of the victim, the seizure of his

property and the robber's escape to a location of temporary safety are all phases in the commission of the crime of robbery linked not only by a proximity of time and distance, but a single-mindedness of the culprit's purpose as well. Accordingly, we conclude that when as in the instant case the finder of fact may have reasonably inferred and accordingly have found that the kidnaping of an individual was to effect a robber's escape such kidnaping is proscribed by the provisions of section 209.[6]

The conclusions we reach today are not contrary to our holdings in *People* v. *Daniels, supra,* 71 Cal.2d 1119, and *People* v. *Timmons* (1971) 4 Cal.3d 411 [93 Cal.Rptr. 736, 482 P.2d 648]. Implicit in our decision is the requirement that all asportations committed during the escape phase of a robbery which may be classified as section 209 offenses necessarily involve movement that substantially increases the risk of harm to the kidnaped individual over and above that necessarily present in the crime of robbery itself.

 Applying the foregoing to the facts in the instant case, we are compelled to the conclusion that the carrying away of Teeter was for the purpose of effecting defendant's escape from the scene where the robbery was perpetrated. The robbery and kidnaping are too coincidental in time, place and purpose, and the likelihood of the increased risk of harm to which Teeter was exposed too apparent to permit any other determination.[7]

[6]Policy, as well as logic, dictates this result. Historically, our decisions concerning the felony-murder rule acknowledged at an early date that, as a practical matter, a robbery has not terminated until the robber reaches a location of temporary safety. (*People* v. *Dowell, supra,* 204 Cal. 109; *People* v. *Boss, supra,* 210 Cal. 245.) Shortly afterwards (*People* v. *Kristy, supra,* 4 Cal.2d 504), this concept was adopted without modification for use in ascertaining whether particular criminal conduct constitutes a violation of section 209. Because of the close similarity between the underlying policies of felony murder and those of section 209, the transition was smooth. Through the imposition of harsher penalties, both seek to deter an aggravation of the risks to which persons involved in a robbery would otherwise be exposed. And to this extent both are reflections of the skeptical, though sensible, belief that a transgressor's intention to avoid physical injury at the time he embarks upon the venture of perpetrating a robbery serves as no reasonable safeguard that death or physical injury will not result before he finishes.

Compare *People* v. *Ford* (1966) 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132], in which it was found, on the basis of strong evidence, that the defendant did not intend to escape and, therefore, the kidnaping was not a means of perpetrating the robbery.

In *People* v. *Monk* (1961) 56 Cal.2d 288, 295 [14 Cal.Rptr. 633, 363 P.2d 865], and *People* v. *Randazzo* (1957) 48 Cal.2d 484, 489 [310 P.2d 413], we said "that where a kidnaping occurs *after the actual perpetration of a robbery* such kidnaping may be kidnaping for the purpose of robbery if it may reasonably be inferred that the transportation of the victim was to effect the escape of the robber. . . ." (Italics added.) Any inferences drawn from the language of these cases which may be inconsistent with today's holding are disapproved.

[7]It is irrelevant that the victim of the kidnaping was not also the victim of the robbery. As stated earlier, the purpose of section 209 is the protection of the public

Defendant next contends that the search without a warrant of the Mercury automobile by the police at the place where it was impounded on the afternoon of the day of the robbery constituted conduct proscribed by the Fourth Amendment. The materials recovered during the search of the vehicle consisted of papers and documents bearing the various aliases often used by defendant. As previously stated, they were introduced into evidence at trial as tending to prove that defendant was the same person as the individual named in the documents and that he was at the scene of the robbery on the date it occurred. We conclude that defendant's claim with respect to the admissibility of this evidence is without merit.

The case at bench does not fall within our proscription of unreasonable routine inventory searches as enunciated in *Mozzetti* v. *Superior Court* (1971) 4 Cal.3d 699 [94 Cal.Rptr. 412, 484 P.2d 84]. In that case we did not address ourselves to instances like the present in which there was probable cause to believe the searched vehicle either contained evidence of a crime or was an instrumentality of its commission. (*Id.* at p. 703.) In *People* v. *McKinnon* (1972) 7 Cal.3d 899 [103 Cal.Rptr. 897, 500 P.2d 1097] we made it clear that a search without a warrant of an auto-mobile or another readily movable item, founded upon probable cause, may be justified because of its "distinguishing characteristic of mobility" even though in otherwise similar circumstances a search of a fixed structure may be unreasonable within Fourth Amendment prohibitions. (*Id.* at p. 907.) Although in *McKinnon* we dealt with readily movable objects other than a vehicle, we relied on *Chambers* v. *Maroney* (1970) 399 U.S. 42 [26 L.Ed.2d 419, 90 S.Ct. 1975] involving the search without a warrant of an automobile on probable cause. *Chambers* and *McKinnon* establish the rule that when there is probable cause to believe that an automobile stopped on a highway contains contraband, evidence of a crime, or was itself an instrumentality of the commission of one, law enforcement officers need not obtain a warrant before conducting a search since there is no distinction of constitutional proportion between an immediate search on probable cause without a warrant and the automobile's immobilization until one is secured.[8] Having concluded that the mere immobilization of

---

at large, rather than just the victims of the robbery alone. (*People* v. *Zurica* (1964) 225 Cal.App.2d 25 [37 Cal.Rptr. 118]; *People* v. *Baldwin* (1961) 191 Cal.App.2d 83 [12 Cal.Rptr. 365].)

[8]In the instant case there was clearly probable cause to search the Mercury at the site of the robbery. A number of eyewitnesses to the crime saw the two suspects drive up to the market and later unsuccessfully attempt to leave in the same automo-bile and this information was reported to the investigating officers. Having con-nected the robbery with the Mercury on the basis of these reports the officers had reason to suspect that some evidence helpful in the apprehension of the culprits and investigation of the crime would be contained within.

an automobile is as substantial an intrusion on the constitutional rights of the owner or possessor as is an immediate search, we must further consider whether the fact the vehicle is impounded at a police garage before it is searched is also of no greater constitutional significance.

■ It was not unreasonable to transport the vehicle to the garage for safekeeping and further examination. Although defendant had apparently abandoned the automobile in effecting his escape, he or others acting in his behalf could have returned to retrieve it or to remove evidence. The officers did not possess the proper tools to open the trunk and complete their search at the time and place where the vehicle was discovered and each moment of delay significantly improved defendant's chances of avoiding apprehension. We discern no inconvenience or invasion of defendant's rights which further infringed any constitutional prohibition by the fact that the vehicle was removed from the scene of the crime to an impound garage beyond that which would have resulted had a warrant authorizing the impound and search first been obtained. (See *Chambers* v. *Maroney, supra,* 399 U.S. 42, 51-52 [26 L.Ed.2d 419, 428-429], where the vehicle was removed from the place of apprehension to a police station before being searched.) We conclude, accordingly, that the vehicle was properly impounded and searched in accordance with *Chambers* and *McKinnon.*[9]

■ A number of fingerprints were lifted from the Mercury automobile, some of which matched those of defendant. Due to the extensive length of time which had elapsed up to the beginning of the second trial, the testimony of the officers who lifted the prints was not clear with respect to the exact number which had been taken from the vehicle and the time at which comparisons had been made. By emphasizing certain inconsistencies trial counsel attempted to create an inference that the prints had been tampered with. Counsel on appeal argues that the evidence should have been excluded. We disagree and conclude that, inasmuch as defendant "did not point to any indication of actual tampering, did not show how fingerprints could have been forged, and did not establish that anyone who might have been interested in tampering with the prints knew" where they were or had access to them, it was proper to admit the evidence and permit the speculation urged by defendant to go to its weight. (*People* v. *Riser* (1956) 47 Cal.2d 566, 581 [305 P.2d 1].)

■ Defendant also complains of a search of the residence of Otis

[9]For reasons set forth in *McKinnon* we deem *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443 [29 L.Ed.2d 564, 91 S.Ct. 2022] to be both factually distinguishable and not controlling.

Graham where for a period of approximately five days prior to the robbery defendant and Lowrie occupied a room. Police officers visited the Graham residence on the morning following the robbery. When questioned, Graham acknowledged the two men had stayed there and consented to a search of his home. He showed the officers the room which defendant and Lowrie occupied and indicated that certain garments, some hanging in a closet and others piled with documents in open cardboard cartons on the floor, belonged to the two men. Graham also gave his consent for the removal of these articles. Such evidence was introduced at trial and used as tending to link defendant with the commission of the robbery. On appeal, defendant asserts that this evidence was illegally obtained and was therefore inadmissible at trial.

It is undisputed that the officers had consensual authority to enter the Graham residence. The crucial question is whether the officers were also entitled to seize the property of defendant. The People contend that defendant's belief that Graham would safeguard his clothing from governmental inspection formed too fragile a foundation for a reasonable expectation of privacy. They argue that under the Fourth Amendment a defendant may not legitimately entertain a reasonable expectation of privacy in the event his trust in an apparent colleague is misplaced. (*United States* v. *White* (1971) 401 U.S. 745 [28 L.Ed.2d 453, 91 S.Ct. 1122].) Defendant, on the other hand, contends that at most the consent extended to the officers by Graham permitted them to look about the house and could not properly bestow upon them the authority to seize any of defendant's personal effects entrusted to Graham. (*People* v. *Cruz* (1964) 61 Cal.2d 861, 866 [40 Cal.Rptr. 841, 395 P.2d 889]; see also *People* v. *Edwards* (1969) 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713].) Whatever the merits, a resolution of this issue need not be made. In view of other competent and overwhelming evidence of defendant's participation in the robbery we are satisfied beyond a reasonable doubt that the evidence obtained at the Graham residence "did not contribute to the verdict obtained." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; see also *People* v. *Haston* (1968) 69 Cal.2d 233, 253 [70 Cal.Rptr. 419, 444 P.2d 91].) The inculpatory documents discovered in the abandoned Mercury, defendant's fingerprints found on the car, the incriminating testimony related by Graham, coupled with the testimony of numerous individuals who positively identified defendant as one of the culprits, compellingly establish defendant's guilt and offset any material effect the meager evidence seized in Graham's house might have had.

Defendant further complains that the trial court erred in refusing

to grant a motion to continue the trial to allow him an opportunity to bring the accomplice Lowrie from the State of Nebraska where he was then imprisoned to testify as a witness. The motion was made near the end of defendant's case after he had called numerous other witnesses. Lowrie had been available as a witness at the first trial but had not been called by either the prosecution or defense. The nature of Lowrie's expected testimony does not appear but defendant apparently based his defense on alibi, that he was not in the State of California at the time of the commission of the offenses and, presumably, Lowrie would support testimony of defendant and other defense witnesses.

It appeared on argument of the motion that Nebraska authorities would not deliver Lowrie and that there was no current statutory procedure by which his attendance could be compelled as a witness. Defense counsel stated that Lowrie might be able to appear "within a few weeks" as extradition proceedings, although resisted by Lowrie, were then pending. The trial court was thus confronted with the circumstance that to grant the motion would require a jury trial interruption of substantial and somewhat indefinite proportions for the purpose of producing an impeachable witness whose testimony was not sought at the first trial, although available, and would likely be merely cumulative of that of other defense witnesses.

█ The granting or denial of a motion for a continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge who must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion. In the lack of a showing of an abuse of discretion or of prejudice to the defendant, a denial of his motion for a continuance cannot result in a reversal of a judgment of conviction. (*People* v. *Ketchel, supra,* 59 Cal.2d 503, 546; *People* v. *Dickerson* (1969) 270 Cal.App.2d 352, 361 [75 Cal.Rptr. 828].) █ Defendant fails to demonstrate and our examination fails to disclose either an abuse of discretion or resulting prejudice in the instant case.

█ Defendant also complains of pretrial photographic and lineup identification procedures. We have, however, reviewed testimony developed at the second trial on these issues and have compared such record with that considered by the Court of Appeal in disposing of the issues favorably to the People on appeal from the first judgment of conviction. (*People* v. *Laursen, supra,* 264 Cal.App.2d 932, 942-945.) There is no material

variance between the testimony at the two trials and basic legal principles applicable have not changed. These issues already having been litigated further consideration thereof is precluded by the doctrine of the law of the case. (*People* v. *Terry* (1964) 61 Cal.2d 137, 151 [37 Cal.Rptr. 605, 390 P.2d 381].)

Defendant's remaining contentions are either not cognizable on appeal for failure to have preserved them or, after our careful examination of the record, deemed to be so lacking in merit that they are not deserving of any discussion.

The judgment of conviction is affirmed.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied December 7, 1972.