MURRAY, J.
*466 Defendant and codefendant[1] approached S.A. in his parked car and, at gunpoint, took several items from him including his wallet, keys, and cell phone. Still at gunpoint, they made S.A. move from the driver's seat to the trunk, placed him in the trunk and closed it, and then continued to look through the car. Defendant and codefendant then fled, leaving S.A. in the trunk. Shortly thereafter, using S.A.'s keys, defendant and codefendant entered the apartment S.A. shared with his fiancé, A.L.G., and her two children. At gunpoint, they demanded that A.L.G. give them whatever guns and money that were in the apartment. After obtaining two guns and other items, they left.
Defendant and codefendant were tried together. The jury found defendant guilty of kidnapping to commit robbery ( Pen. Code, § 209, subd. (b)(1) ; count one (victim-S.A.) ),[2] robbery in the second degree (§ 211; count two (victim-S.A.) ), possession of a firearm by a felon (§ 29800, subd. (a)(1); counts three & five), and robbery in the first degree (§ 211; count four (victim-A.L.G.) ). The jury also found true vicarious arming enhancements for being a principal in the commission of the counts of kidnapping for robbery and second degree robbery where one of the principals was armed *467 with a firearm (§ 12022, subd. (a)(1) ), and an enhancement for personal use of a firearm on the first degree robbery count (§ 12022.53, subd. (b) ). The *608 court sentenced defendant to seven years to life, plus a determinate term of 17 years eight months.
On appeal, defendant asserts that: (1) the trial court abused its discretion in denying the defense motion to sever count six, charging only codefendant with being a felon in possession of a firearm (§ 29800, subd. (a)(1) ) based on the discovery of a handgun in codefendant's backpack approximately three months after the robberies of S.A. and A.L.G.; (2) the evidence was legally insufficient to support the conviction of kidnapping to commit robbery because it failed to establish that the movement of S.A. from the driver's seat to the trunk of his car was more than incidental to the commission of the robbery and that it increased the risk of harm to S.A.; and (3) the court erred in the manner in which it modified CALCRIM No. 1203. In supplemental briefing, defendant asserts that: (4) he is entitled to remand for a Franklin[3] hearing, and (5) remand is also required for the trial court to consider whether to exercise its discretion to strike the section 12022.53, subdivision (b), firearm use enhancement following the passage of Senate Bill No. 620.
In the published portion of this opinion, we conclude that the trial court did not err in instructing the jury with the modified version of CALCRIM No. 1203. In the unpublished portions of this opinion, we conclude that the trial court did not abuse its discretion in denying the defense motion to sever; nor were defendant's due process and fair trial rights violated by the joinder. We also conclude that the evidence was legally sufficient to support the conviction of kidnapping to commit robbery. Finding merit to the contentions raised by defendant in his supplemental briefing, we remand the matter to the trial court for a Franklin hearing and for the trial court to exercise its discretion under section 12022.53, subdivision (h), to consider whether to strike the section 12022.53, subdivision (b), enhancement. We otherwise affirm.
FACTUAL AND PROCEDURAL BACKGROUND
The People's Case
S.A. testified that, on May 13, 2013, he went out to run some errands. He then decided to go to an apartment complex to see if a friend wanted to play basketball. S.A. parked his silver Dodge Charger at the apartment complex and reached for his phone to call his friend. Before S.A. could place the call, *468 he saw an individual next to his car door. S.A. identified defendant at trial as that individual. Defendant said, "[W]hat's up, Bro, you know what time it is." Then codefendant, who S.A. also identified at trial, opened the front passenger door and entered S.A.'s car. Codefendant pointed a gun at S.A.'s head and told him not to move or he would shoot.
The description of the gun wielded by codefendant is at the heart of the severance issue. S.A. testified that the gun was a black semiautomatic with "a little silver on the top." S.A. also testified that "it wasn't that much silver. It had just a little piece of silver in it."
Both defendant and codefendant began to pat down S.A.'s pants and one of them removed S.A.'s wallet containing his California driver's license bearing an old address, his Social Security card, a medical card bearing his current address, a debit card, and cash. Codefendant then snatched *609 the keys from the ignition of S.A.'s car and also grabbed S.A.'s phone.
Defendant and codefendant ordered S.A. to get out of the car. Defendant grabbed S.A.'s hands and pulled him out. At that time, S.A. observed an individual nearby with whom he was familiar. Defendant chased that individual off while codefendant stayed near S.A. with the gun pointed at him. S.A. testified that defendant had no difficulty moving around, standing, or leaning over, and he was not limping. Nor did he notice codefendant having any difficulty moving around. After chasing the individual away, defendant returned to S.A. and "got in [his] face again."
Defendant opened the trunk. Codefendant continued to point the gun at S.A.'s head, and defendant and codefendant told S.A. to get into the trunk. S.A. was moved six to eight feet to the trunk with codefendant's gun still pointed at his head. While being moved to the trunk, S.A. begged, "[D]on't do this, please don't do this." Defendant and codefendant then "shoved" S.A. into the trunk and closed it. S.A. described himself as a "big guy" and testified that it was "hard to fit" into the trunk. Because of his size, the trunk lid did not close all the way and someone slammed it down on him to get it to close. However, S.A. testified that he suffered no injury during the incident.
Deon Hopkins drove into the complex's parking lot and saw what he thought was someone digging around in the trunk of a gray Charger, perhaps "messing with some music." Hopkins then thought he saw the person get into the trunk of the Charger. He asked his cousin, Marvin Hollis, who was in the car with him, if he saw the same thing, but Hollis had not noticed it.
While in the trunk of his car, S.A. could hear defendant and codefendant "going through the car." He "heard stuff moving, doors opening, my dash *469 opening, my arm rest opening, just ... heard them going through the car." This lasted for five to ten minutes. During this time, S.A. was scared. He did not know what was going to happen, but he thought he would probably never see his family again.
Hollis observed two individuals, a larger dark-skinned individual and a smaller light-skinned individual, standing outside of a gray Charger with its doors open. The two men then walked away from the Charger. According to Hollis, the two men were moving fast. They got into a cream-colored Lexus and drove off. Hopkins went inside the apartment complex while Hollis remained outside and smoked a cigarette.
Once S.A. no longer heard any noise outside, he pulled the emergency release lever in the trunk and opened it. When S.A. saw that no one was around his car, he got out of the trunk. As Hollis finished his cigarette, approximately two minutes after the two men drove off in the Lexus, he saw S.A. climb out of the trunk of the Charger. S.A. seemed frightened. S.A. approached Hollis and asked him for help, and Hollis gave S.A. his cell phone.
S.A. called 911 to report the incident. Among other things, he told the 911 operator that the perpetrators were driving a gold Lexus. According to S.A., Hollis had told him that "the guys over here ran into the gold car and drove off." A couple of minutes later, Officer Arik Farahmand arrived, and S.A. described the incident to him. Farahmand also spoke to Hopkins and Hollis. At trial, Hollis was unable to identify defendant or codefendant as the perpetrators. He explained that after a year, he no longer remembered what they looked like and in any event, he only "got a quick glance" at them.
Meanwhile, A.L.G. was with her two children at the apartment she shared with *610 S.A. when she heard a knock on the door.[4] She answered the door and saw defendant, who, using only S.A.'s first name, asked if he was home. A.L.G. responded that he was not. She began to close the door when codefendant placed his foot against the door. One of the men then said that S.A. told him they could wait for him at home. A.L.G. had never seen defendant or codefendant before, and she was alarmed because S.A.'s friends never referred to him by his first name. A.L.G. told them "that's not [S.A.]," and told codefendant to move his foot. She then pushed the door as hard as she could, and managed to close and lock it. *470 After she closed the door, A.L.G. retrieved her handgun.[5] As she grabbed the handgun, she heard the sound of keys. A.L.G. recognized the sound of S.A.'s keychain. The front door then flew open. A.L.G. attempted to cock the handgun, but she was holding her four-month-old daughter and could not manage to do so. Codefendant wrested the gun away from A.L.G. and put it in his pocket. Defendant, who had a shirt concealing part of his face, came up behind A.L.G. and placed a gun to her temple. Defendant asked where the guns were. At first, A.L.G. stated that she did not have anything and asked the men to leave. Codefendant then said something about A.L.G.'s son, which scared her, and she told the men about their other gun. Defendant walked A.L.G. to the bedroom, A.L.G. reached for a Mossburg shotgun she had, and codefendant grabbed it. The men then asked where the money was. A.L.G. responded that she only had three dollars in her wallet and she emptied the contents of her purse. The men took a couple of sweaters and a baby blanket to conceal the guns. As they moved toward the front door, defendant grabbed A.L.G.'s cell phone. A.L.G. asked to keep it because it had information on it about her son's disability as well as other important matters. Defendant stated that he was going to take the phone so that A.L.G. would not call the police, but he let A.L.G. remove the SIM card from the phone. The two men then opened the door, one of the men dropped S.A.'s keys at A.L.G.'s feet, and then they both left. As defendant was leaving, he removed the shirt that was covering his face and threw it to the ground.
Two neighbors saw two men running from A.L.G.'s apartment. Neither one noticed or recalled either man limping. They were unable to identify defendant or codefendant at trial. A.L.G. ran outside and screamed for help. A neighbor from upstairs responded and called the police.
Meanwhile, approximately two minutes after Officer Farahmand's arrival at S.A.'s location, while Farahmand was speaking with S.A., a broadcast over the officer's radio indicated that there had been a report of a home invasion robbery at S.A.'s address. S.A. asked Farahmand to take him home to see if his family was okay. As they were on their way to S.A.'s house, Farahmand had S.A. view a suspect who had been detained by police. However, the suspect was not one of the perpetrators. They then drove directly to S.A.'s apartment.
*611 Latent fingerprints were later lifted from the Charger, 11 prints from the trunk lid and one from the passenger-side door. A latent palm print lifted from *471 the trunk of the Charger matched defendant's palm print. A latent fingerprint from the trunk lid of the Charger matched codefendant's left middle fingerprint. Another latent fingerprint from the trunk lid of the Charger matched a third person. S.A. testified he had a friend who had the same name as this third person. The fingerprint expert testified that a fingerprint could remain on a surface indefinitely and that there was no way of determining how long a particular print had been on a surface.
Detective Christina Mortenson was informed of the names of the three individuals whose fingerprints were discovered on the Charger. Mortenson prepared two photographic lineups with defendant in one and codefendant in another, along with "fillers," who were of similar in age and appearance to defendant and codefendant.[6]
On July 18, 2013, Mortenson had S.A. view the two photo lineups. In one, S.A. identified defendant as the man who had stood next to him at the driver's-side door. S.A. was sure of his identification of defendant. Indeed, according to Mortenson, S.A. immediately pointed to defendant's photograph, and stated, "I can't forget that face." He said he was "300 percent sure that was him." In another photo lineup, S.A. identified codefendant as the man who had been at the passenger-side door holding the gun.
On the same date, Mortenson showed A.L.G. two photo lineups. In the photo lineup in which defendant appeared, A.L.G. narrowed the possibilities down to two, defendant and one other, but could not be sure which of the two was one of the perpetrators. A.L.G. was also not sure of an identification in the photo lineup in which codefendant appeared.
On August 20, 2013, Officer Alvaro Sanchez responded to the location of a vehicle stop where codefendant was in custody. Sanchez then went to the premises where codefendant indicated he had been staying. Codefendant's grandmother stated that there was a backpack belonging to codefendant in her bedroom. Sanchez obtained the backpack and looked through it. In the backpack, Sanchez found mail to codefendant and a loaded handgun. The handgun was a black and silver Smith & Wesson nine millimeter. However, when S.A. was shown this handgun at trial, he testified that it was not the handgun used by the perpetrators who robbed him on May 13, 2013.
On January 23, 2014, defendant was arrested in Louisiana on an arrest warrant.
*472 As noted, S.A. identified defendant and the codefendant in photo lineups and again at trial. S.A. testified that, prior to the incident on March 13, 2013, he had never met defendant or codefendant. S.A. acknowledged describing defendant to the police as light-skinned in his early twenties, approximately five foot eleven inches, weighing 130 to 140 pounds, wearing a white tank top and blue shorts. S.A. also noticed a tattoo on defendant's face,[7] but did not notice other tattoos. S.A. described codefendant as dark-skinned, approximately *612 six foot one inch or six foot two inches, almost 300 pounds, in his late twenties, wearing a white T-shirt. On cross-examination, S.A. acknowledged that, in prior testimony, he had estimated that codefendant weighed approximately 200 pounds.
S.A. testified that at the time of the robbery, codefendant had short hair styled in twisties that were an inch long or shorter. A.L.G. also described one of the two perpetrators has having his hair in "twisties." She also said he had a "small beard."
A.L.G. viewed two in-person lineups, one including codefendant on August 29, 2013, the other including defendant on February 6, 2014. Regarding defendant's lineup, A.L.G. indicated that she was not certain, but she believed the person in position number two, which was defendant, was one of the perpetrators. In the lineup including codefendant, the participants were instructed to say, "Where's the guns?" A.L.G. identified codefendant. She testified that it was easier to remember and make an identification seeing the individual face-to-face, and that hearing codefendant's voice aided her in making the identification. She also recognized codefendant by the shape of his head. At trial, A.L.G. stated that she had no doubt that defendant and codefendant were the people who barged into her home and took property.
Codefendant's Case
Codefendant's cousin, Dari Britton, testified that codefendant had a slight limp. He had been shot in his leg at least 10 years prior to trial, and he had a metal rod implanted, causing him to walk with a noticeable limp. Since he sustained that injury, Britton had never seen codefendant attempt to run.
Britton also testified that codefendant had a scar over one eye which he had sustained more than 10 years earlier. Additionally, she testified that codefendant always wore his hair as it was at trial, which was very short. She testified that she had not known codefendant in the last several years to have hair long enough to wear it in twisties, and it was not long enough to do so in *473 May 2013. She also told a defense investigator that codefendant never had twisties or facial hair, but upon being confronted with photographs spanning from 2005 to 2013 at trial, she admitted that codefendant had had facial hair.
Defendant's Case
Defendant testified on his own behalf. He acknowledged juvenile adjudications for battery, theft, resisting arrest, armed robbery, and first degree burglary. He also had adult convictions for evading a peace officer and two convictions for domestic violence. He testified that he knew codefendant from seeing him when they were in the same pod in jail.
Defendant denied being involved in either robbery.
In April 2013, defendant was at a gas station when a car pulled up and someone in the car fired an assault rifle. Defendant was shot in the shoulder, thigh, and buttocks, and the left side of his face and hand were grazed. Defendant was released from the hospital the day after he was admitted. Defendant still had a bullet in his left shoulder and a bullet in his left buttocks.
Defendant testified that, in the weeks between April 18, 2013, and May 13, 2013, he walked with a limp and was incapable of running. For the first several weeks, he required help to get up. He was also experiencing excruciating pain. Defendant wore a sling for two or three weeks after the shooting, and he could not lift anything due to the bullet in his shoulder. He could not hold his daughter, and testified that he would have been unable to hold someone and hold a gun to a person's head in the *613 manner described by A.L.G. On cross-examination, defendant acknowledged that his hospital records stated that he had suffered no serious injury and that he had been directed to walk four to five times a day after discharge.
Shirley Shaw, the grandmother of defendant's wife, testified that, after defendant had been shot in his shoulder, hip, and leg in April 2013, she visited him frequently and helped him around the house. Shaw testified that, in the month after defendant sustained the injury, he walked with a limp because he had been shot and was in pain. According to Shaw, defendant would "slide his leg like Frankenstein" when he walked. He was also unable to run, get into or out of a car quickly, or lift his daughter, who weighed approximately 15 pounds at the time.
At trial, defendant had tattoos from his jaw line to the bottom of his neck. He testified he got these tattoos in late March or early April of 2013. He also had tattoos on both hands and on his right forearm, which he claimed to have *474 had since he was 15 years old. The teardrop tattoo on his face had been there since defendant was 15 or 16 years old.
Defendant testified that he knew S.A. He testified that, within two weeks of the day he was shot, he was in a parking lot waiting for Shaw, who was grocery shopping, when he called a friend to ask if he knew where defendant could obtain some marijuana. Defendant's friend called him back and said, "He's in the same parking lot as you." As a result, defendant met up with S.A. who was in his car, gave him money through the window of the car, obtained marijuana from S.A., and S.A. drove away. Defendant did not recall touching the trunk of the car. Defendant had not otherwise encountered S.A. Sometime after he had been shot, codefendant called defendant to ask if he knew where he could obtain marijuana. Defendant directed codefendant to the same friend who had referred defendant to S.A.
Verdict and Sentencing
The jury found defendant guilty of kidnapping to commit robbery, robbery in the second degree, two counts of possession of a firearm by a felon, and robbery in the first degree. The jury also found the firearm arming and use enhancements to be true.
The trial court sentenced defendant to seven years to life, plus a determinate term of 17 years eight months calculated as follows: on count one, kidnapping to commit robbery, an indeterminate term of seven years to life plus one year for the vicarious arming enhancement pursuant to section 12022, subdivision (a)(1); on count four, robbery in the first degree, six years plus 10 years for the firearm use enhancement pursuant to section 12022.53, subdivision (b); and on count five, felon in possession of a firearm, eight months. Upper terms were imposed and stayed pursuant to section 654 on counts two, robbery in the second degree, and three, felon in possession of a firearm. The term on the section 12022, subdivision (a)(1), arming enhancement on count two was also imposed and stayed pursuant to section 654.
DISCUSSION
I.-II.**
*475 III. CALCRIM No. 1203 as Modified
A. Defendant's Contentions
Defendant asserts that the trial court erred in instructing the jury with a version of CALCRIM No. 1203, modified at the prosecutor's request, because the modified *614 version allowed the jury to convict him of kidnapping to commit robbery on a theory not supported by the evidence. Specifically, defendant contends that the trial court committed reversible error in modifying CALCRIM No. 1203 to specify that the intent to commit robbery includes the intent to aid in the escape from the robbery. Defendant asserts that there was no evidence to support a theory that the asportation of S.A. occurred in order to effectuate defendant and codefendant's escape.
We disagree. We conclude that the theory of liability represented by CALCRIM No. 1203, as modified and given, was supported by substantial evidence.
B. Additional Background
At the initial instruction conference, the trial court indicated that it would give CALCRIM No. 1203. Defendant did not object.
At the close of all evidence, the court indicated that the prosecutor had submitted a request for a pinpoint instruction in connection with CALCRIM No. 1203 based on People v. Laursen (1972) 8 Cal.3d 192, 104 Cal.Rptr. 425, 501 P.2d 1145 ( Laursen ). Defendant's counsel objected based on the distance of the movement, and codefendant joined in the objection. The court noted the potential for jury confusion if the jury believed that, once a taking had occurred, the robbery was over, which is not the state of the law as set forth in Laursen . The court continued: "So what I would propose to do was to keep it in line with the movement and substantial distance element to modify number two, the element number two as follows: It reads acting with that intent, because they're referring to intent to commit a robbery, what I propose is acting with the intent to commit robbery, including the intent to aid in the escape from the intended robbery, the defendant took, held or detained." Defendant's counsel and codefendant's counsel objected and submitted.
The court issued a modified version of CALCRIM No. 1203, which read as follows: "The defendants are charged in Count 1 with kidnapping for the purpose of robbery in violation of ... [s]ection 209(b). [¶] To prove that a defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant intended to commit robbery; [¶] 2. Acting with the intent to commit robbery including the intent to aid in the escape from the intended *476 robbery , the defendant took, held or detained another person by using force or by instilling a reasonable fear;[11 ][¶] 3. Using that force or fear, the defendant moved the other person or made the other person move a substantial distance; [¶] 4. The other person was moved or made to move a distance beyond that merely incidental to the commission of the robbery; [¶] 5. When that movement began, the defendant already intended to commit robbery; and [¶] 6. The other person did not consent to the movement. [¶] As used here, substantial distance means more than a slight or trivial distance. The movement must have increased the risk of physical or psychological harm to the person beyond that necessarily present in the robbery. In deciding whether the movement was sufficient, consider all the circumstances relating to the movement. [¶] In order to consent, a person must act freely and voluntarily and know the nature of the act." ( CALCRIM No. 1203, as given, italics added.)
C. Standard of Review and Applicable Principles
" ' "It is settled that in criminal cases, even in the absence of a request, the *615 trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " ( People v. Breverman (1998) 19 Cal.4th 142, 154, 77 Cal.Rptr.2d 870, 960 P.2d 1094.) "A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof." ( People v. Cole (2004) 33 Cal.4th 1158, 1206, 17 Cal.Rptr.3d 532, 95 P.3d 811.) An appellate court reviews the trial court's decision to give a particular instruction de novo. ( Ibid . ) In doing so, we must determine whether there was sufficient evidence to support the challenged instruction ( ibid . ), and whether the instructions delivered a correct statement of the law ( People v. Fiu (2008) 165 Cal.App.4th 360, 370, 81 Cal.Rptr.3d 32 ["the instructions must be complete and a correct statement of the law"] ). Here, we must determine whether a reasonable trier of fact could have found, beyond a reasonable doubt, that the evidence demonstrated that defendant and codefendant moved S.A., at least in part, to effectuate their escape. (See generally Cole , at p. 1206, 17 Cal.Rptr.3d 532, 95 P.3d 811.) *477 D. Analysis
In Laursen , our high court held that "a kidnaping committed while in the act of escaping from the site of a robbery falls within the meaning of 'kidnaping for the purpose of robbery' as proscribed by section 209." ( Laursen, supra , 8 Cal.3d at p. 196, 104 Cal.Rptr. 425, 501 P.2d 1145.) The court reasoned: "The assault of the victim, the seizure of his property and the robber's escape to a location of temporary safety are all phases in the commission of the crime of robbery linked not only by a proximity of time and distance, but a singlemindedness of the culprit's purpose as well." ( Id . at pp. 199-200, 104 Cal.Rptr. 425, 501 P.2d 1145.) Thus, escape to a location of temporary safety is a phase in the commission of a robbery and where the finder of fact can "reasonably infer[ ] ... that the kidnaping of an individual was to effect a robber's escape such kidnaping is proscribed by the provisions of section 209." ( Id . at pp. 196, 199-200, 104 Cal.Rptr. 425, 501 P.2d 1145.) In light of Laursen , the instruction, as modified, was a correct statement of law.
Of course, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." ( People v. Guiton (1993) 4 Cal.4th 1116, 1129, 17 Cal.Rptr.2d 365, 847 P.2d 45.) Thus, only where there is substantial evidence to support the theory that the asportation of the victim was undertaken, at least in part, to effectuate the robber's escape, will it be proper to give an instruction such as the one given by the trial court here.
We conclude that the instruction, as modified and given, was supported by substantial evidence. On this record, a rational trier of fact could have concluded, beyond a reasonable doubt, that the asportation of S.A. from the driver's seat to the trunk of his car was undertaken, at least in part, to effectuate defendant and codefendant's escape. While defendant is correct that S.A. heard the perpetrators rummaging through his car for five to ten minutes after placing him in the trunk, this does not establish that the sole reason that they placed S.A. in the trunk was to take property. The mere fact that the perpetrators did not immediately flee upon placing S.A. in the trunk does not establish, as argued *616 by defendant, that "the movement of [S.A.] to the trunk was not for the purpose of effectuating the robbers['] escape, but rather for the purpose of facilitating the robbery." Based on the trial evidence, the jury could have reasonably inferred that, by placing S.A. in the trunk, defendant and codefendant ensured that S.A. could not continue to observe them and memorize their descriptions, that he could not observe when or how they departed, that he would not see their vehicle or where they went, and that, until S.A. escaped, he would not be able to seek help or contact the police. We conclude that substantial evidence was present to support the theory that the robbers' intent in moving S.A. to the trunk was, at least in part, to aid in their escape. *478 Because CALCRIM No. 1203, as modified and given to the jury, was both a correct statement of law and supported by substantial evidence, the trial court did not err in issuing the modified instruction.[12]
IV.-V.***
DISPOSITION
The judgment is affirmed. The matter is remanded to the trial court for a Franklin hearing and for the trial court to exercise its discretion under section 12022.53, subdivision (h), whether to strike the section 12022.53, subdivision (b), enhancement.
We concur:
HULL, Acting P. J.
RENNER, J.

The codefendant, Dontae LaRail McFadden, is not a party to this appeal.

Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

People v. Franklin (2016) 63 Cal.4th 261, 202 Cal.Rptr.3d 496, 370 P.3d 1053 (Franklin ).

S.A. stated that the children were his daughter and his stepson.

A.L.G. testified that she had purchased the handgun for herself and she had purchased a shotgun for S.A. She testified that there were shootings and robberies at the apartment complex over the several months prior to the incidents at issue here, and she did not feel safe, particularly when S.A. was gone and she was alone in the apartment with her children. When S.A. would go out, A.L.G. would place the handgun where she could easily retrieve it if someone attempted to come in.

On cross-examination, Mortenson acknowledged that she did not prepare a photo lineup using a photograph of the third person's whose print was found on the Charger. Nor did she conduct an in-person lineup including that third person. She also acknowledged that she had never spoken with that person in connection with this case. That person was a 43-year-old black male.

S.A. testified that he did not remember what the tattoo looked like and also explained that he was not wearing his glasses at the time of the robbery.

See footnote *, ante .

Without the modified text set forth in italics, element number 2 in the standard version of CALCRIM No. 1203 reads: "2. Acting with that intent, the defendant took, held, or detained another person by using force or by instilling a reasonable fear."

We recommend that the CALCRIM committee consider modifying CALCRIM No. 1203 to provide optional language addressing situations where, as here, there is substantial evidence supporting a finding that during the course of a robbery, the perpetrators moved the victim to, at least in part, effectuate their escape.

See footnote *, ante .