Filed 7/14/22  P. v. Wilson CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H047235 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1894149) |
| v. | |
| TYLER GRAGGFISHER WILSON, | |
| Defendant and Appellant. | |

A jury convicted defendant Tyler Graggfisher Wilson of infliction of corporal injury on a cohabitant or someone with whom defendant has or previously had a dating relationship (Pen. Code, § 273.5, subd. (a)).[1]  The trial court suspended imposition of sentence and granted Wilson three years of probation, with various terms and conditions, which included a 300-day county jail sentence.

On appeal, Wilson argues that the trial court erred by refusing to instruct the jury on the defense of accident and by giving the jury a pinpoint instruction that stated Wilson did not have to intend to injure the victim.  He also contends that the trial court erred by allowing the prosecution's expert witness to give an opinion in response to a hypothetical that mirrored the facts of the case.  Finally, he argues that the cumulative impact of the prejudice from the alleged instructional and evidentiary errors rendered his trial fundamentally unfair.  We reject Wilson's arguments and affirm the judgment.

---

[1] Unspecified statutory references are to the Penal Code.

# I. BACKGROUND

## A. Prosecution's Case

### 1. 911 Call and Investigation

On April 30, 2018, K.H.[2] called 911 to report that Wilson "[s]lammed my hand in the door" as she was "trying to leave, and he got upset." K.H. stated, "he kicked me and he actually physically pushed me, and then he slammed my hand in the door." K.H. explained that she was "outside the apartment, [Wilson] got upset because I took some of my money, he kicked me out on a . . . [d]ay's notice." She added, "I don't have a nail . . . [he] [r]ipped off a nail." K.H. stated that Wilson was "definitely . . . high on meth, he is high on heroin."

After further questioning about the extent of her injuries, K.H. elaborated that she was bleeding from "all my fingers." "[Wilson] completely ripped off my nails, and he kept doing it. And he kept doing it." K.H. stated that this was "the first time he kicked me out." The dispatcher asked about weapons in the apartment, and K.H. answered, "No, but he has physically hurt me before."

The dispatcher asked if Wilson was still in the apartment. K.H. answered, "Yes, I'm gonna need stiches. It, it's deep." The dispatcher asked about K.H.'s injuries. K.H. responded, "He slammed my hand in the door." She added: "At least 3 times." K.H. stated, "And I asked him to please let go, please let go" "and he wouldn't. He was, he gets in this rage where he just, he doesn't, don't, and I don't know what to do." K.H. explained that she had told Wilson she had "someone coming on the way to pick me up to leave." However, "he didn't want me to go." According to K.H., she was trying to gather her "most precious things," including her phone bag with her jewelry, and "just

---

[2] The victim was ordered to appear and testify in this case. However, she did not comply with the court's order and did not testify during the trial. K.H.'s statements in the 911 call recording were admitted under the excited utterance exception to the hearsay rule and were found to be nontestimonial. The 911 call was played for the jury and admitted into evidence.

was trying to get out of the situation." She wanted to leave because Wilson "kept getting more and more aggressive." She added: "And I didn't want, I didn't wanna be hit." "And, and then he finally shoved me out the door, and he slammed my hand several times, I, I don't have nails on two of my fingers."

After responding to the dispatcher's questions about her date of birth, K.H. offered unprompted: "I, I just see, it's not in his character, he lost it, he completely blacked out, and he started slamming my hand." She continued: "And he said I owed him money, and I don't owe him money, I was just trying to get out of there . . . ." She later added: "[H]e flipped over the couch 'cause I tried to take his" "[d]rugs away from him." After discussing her exact location in the apartment complex, K.H. stated, "He . . . kick[ed] me out of his house . . . today out of nowhere, and I had a friend coming to pick me up." "And he got mad, he thought I stole his drugs, and I, I don't, I don't know where his drugs are, I took half of our money." K.H. went outside and soon found a responding police officer.

San Jose Police Officers Ronald Rosario and Mark Stephens were dispatched in response to the 911 call. Stephens contacted K.H., who was "crying, upset, appeared to be in pain" and "[w]as holding her hand." Her hand, which was wrapped with paper towels and soaked with blood, appeared to be injured. "[O]ne of her fingers was badly injured. It was a lot of blood. It had a deep cut to it, and the fingernail was missing." Stephens was "pretty startled by the injury" because it was "bad."

K.H.'s interactions with Rosario and Stephens were captured by Rosario's body-worn camera, which was played for the jury and admitted into evidence. After making contact with the officers, K.H. stated unprompted, "He slammed it at least three times after I told him my hand was in the door." She added: "And I have no nails now, they were ripped off." Rosario informed K.H. that an ambulance was en route. He then asked, "were you guys fighting?" She responded, "He kicked me out. He—he's been on drugs." K.H. stated that she told Wilson, " 'Okay, let me go. I have someone coming on

3

their way.' " Then, "he shoved me out the door." Rosario asked, "He tried to push you out of the door?" K.H. stated, "And I got my arm cut, and he just kept slamming it and slamming it because I took half of the thousand [dollars] that I was rightfully owed." Rosario then asked, "So, money issues. Did he know that your hand was—" K.H. interrupted, "I don't want him to go to jail though." Rosario responded, "you called us and we're here to help you." K.H. insisted, "I didn't call. I didn't call." She then stated, "I just want—I just want some medical care."

Rosario asked K.H., "Did he know that your hand was in the [door]?" K.H. responded, "Yes, I told him. I said, 'Please, my hands are right up here.' " Rosario asked, "How many times did you say he slammed your hand in the . . . ?" K.H. stated "It hit three times at least." Rosario continued, "Three times, okay. What was he saying when—when he was hitting." She first stated, "Nothing," then stated Wilson said that K.H. "deserve[d] it." K.H. then added that Wilson said, " 'Get away from me. Get away from me,' " and she responded, "please let me leave."

After speaking to paramedics briefly, K.H. stated, "He didn't—he didn't realize. He wasn't listening." Rosario asked K.H. about the apparent contradiction in what she was saying. She responded, "He didn't know that he was slamming—" "I was yelling, 'Please stop. You're hitting my hand.' And he just kept trying to close the door." Rosario asked, "Okay, let me ask you this. So, he didn't know that your hand was in the door and he tried closing it to try to get you out of there?" K.H. responded, "Yes." Rosario then asked, "Do you think he would intentionally slam your hand[?]" K.H. responded, "No." Rosario then asked, "So you're saying that he did not know that your hand was in a door . . . until after he hit your—he hit you?" K.H. stated, "Well, he didn't come out to look," despite her telling him, " 'I need you to come out and look at this.' "

Rosario later tried to clarify how K.H. was forced out of the apartment: "So, when you walked out the door, he was going to close it and you—" K.H. interrupted, "[H]e threw me out and I tried to get my stuff." Rosario then said, "So, he pushed you?"

4

K.H. responded, "Yeah, I just tried to get my things." "But, he wouldn't listen when I was saying, 'You're hurting me. You're hurting me. You're hurting me.' " K.H. declined to seek an emergency protective restraining order, saying in response, "It was an honest accident that is really tragic, but it's just if someone's screaming you have to stop." Rosario asked if anything like this had happened before. K.H. responded, "No. He didn't mean to like hit my fingers. He just meant to get me out—"

K.H. was eventually provided domestic violence information and transported to the hospital. At the hospital, K.H. was found to be bleeding from her left index finger and her middle fingers appeared to be in pain. Her injuries were "consistent with a crush injury of the left hand, fingers." The treating physician found "she had partial fingertip amputations right at the level of the nail and those two fingers [had] exposed bone. And two of the nails had been torn out." One of the partially amputated fingers was " 'dangling' " and was "[a]ttached [only] by a little bit of the cuticle." An x-ray revealed that the bones in her fingers were essentially shattered. K.H. was treated by the emergency department and referred to see a hand specialist and plastic surgeon. At a follow-up appointment, no surgery was indicated, because the type of fracture found in K.H.'s hand was "not something that is, in the traditional sense, repairable."

Police determined that K.H. and Wilson were cohabitating and in a romantic relationship. Police went to search the apartment, but found the door barricaded. After forcing their way in, police found that the apartment appeared to be undisturbed. Police saw blood stains on the door jamb of the apartment and on the carpet in the hallway. There were sharp edges around the bracket containing the lock, and the blood was mostly below the bracket. Stephens attempted to lock the door on the way out of the apartment but was unsuccessful because the lock did not appear to work.

### 2. The Neighbor's Testimony

Mandy Llamas is Wilson's neighbor. Llamas knew that K.H. had been staying with Wilson "a little over a year, on and off." On the date of the incident, Llamas heard

5

"crying" and "like yelling," so she opened the door, looked out, and saw K.H. She could not make out words, "[m]ostly just crying and the sounds of pain." K.H. was crouched by Wilson's door and holding her hand, which was bleeding. Llamas helped K.H. clean and wrap the wound.

Llamas did not remember K.H. telling her that Wilson had asked her to leave the apartment. Rather, Llamas remembered K.H. stating, " 'He wouldn't let me in.' " She also recalled K.H. saying, "pretty much, [Wilson] had pushed her out the door." K.H. also told Llamas that "her fingers" got "caught in the door." On recross examination, after having her memory refreshed, Llamas remembered that K.H. told her that "Wilson had asked [K.H.] to leave the apartment." K.H. then "[p]ushed the door back in, or pushed to get in" and "[h]er hand was caught in the door." After having her recollection again refreshed, on redirect, Llamas recalled K.H. telling her "that [Wilson] . . . pushed her out of the apartment, and then she tried to get back inside the apartment."

### 3. Expert Testimony

Richard Ferry, a marriage and family therapist, testified as an expert in "domestic violence and the common experiences of individuals experiencing intimate partner violence." At the outset, Ferry cautioned, "[Y]ou can't look at this problem, domestic violence, and assume one size fits all, that everybody reacts in the same way. There is an enormous individual variation in the ways individuals react." Ferry continued: "The common experiences of individuals in violent relationships is a process. It's an ongoing, unfolding process, and they're not all the same."

There are "eight broad categories" of intimate partner violation. "Those are financial exploitation, isolation, imposing isolation, turning the children against the abused partner, verbal and emotional abuse, harassment and threats. Stalking, physical violence and sexual violence." Intimate partner violence does not necessarily involve physical acts. In addition, someone can be a victim of intimate partner violence with only one violent incident.

6

According to Ferry, it is common for victims to remain with their batterers. "[O]n average," a victim will return to the abuse "five to seven times before they make a final break." Ferry listed a number of "[c]ontradictory behaviors or paradox[ical] behaviors" that a victim of intimate partner abuse may demonstrate: returning to the abuser; making rationalizations for the abuser's behavior; discouraging the police from arresting that person; and discouraging the court system from prosecuting that person. Victims of abuse may adopt informal and formal strategies to deal with the abuse. "Formal strategies include calling the police, filing a police report, [and] collaborating with the district attorney." It is common for a victim of abuse to call the police, ask for help, but shortly after refuse to pursue an emergency protective order. Recanting, or "taking back an accusation that has been made" is also "very common" in the context of intimate partner violence. This includes a victim claiming she "made it all up" or refusing to cooperate in the investigation or come to court. In Ferry's experience, as a form of recanting, it was not unusual "for someone to make [a] statement that a person has hurt them, but . . . close in time make the statement that the incident was an accident."[3]

**B. Defense Case**

On cross examination, Ferry acknowledged that he was paid $1,000 for appearing to testify. He emphasized, however, that he was not paid for his opinions, but only for his time. Ferry also acknowledged that men can be victims of intimate partner violence and that sometimes victims fail to come to court because the allegations were exaggerated. He agreed that it was "fair to say" that "[w]hen people are intoxicated . . . they're prone to exaggeration" and alcohol "tends to increase the chances that there could be a domestic violence incident."

Officer Rosario testified that he wrote in his police report after the incident that K.H. was " 'under the influence of alcohol.' " Rosario also recalled that K.H. stated she

---

[3] Ferry's challenged testimony about the hypothetical question will be described below in the Discussion section.

7

had "no nails now" and "[t]hey were ripped off," even though not all of her nails were actually missing from her fingers. He also recalled K.H.'s statement that "it was an honest accident," that she just wanted medical attention, and that she did not want to seek an emergency protective order.

Officer Stephens testified that he made contact with Wilson in the front of the apartment building at the time of the incident and that he consented without hesitation to an examination of his apartment. Although there was some difficulty in getting into the apartment, they were able to examine it and "[i]t did not appear to be disturbed." Stephens was asked if the apartment door was a "solid wooden door" that was "heavy," but could not recall.

During cross-examination, Llamas acknowledged that her apartment door, like Wilson's door, was a "solid wood door" that was "heavy" with a metal bracket above and below the door handle. Llamas affirmed that K.H. never said that Wilson was "an abusive guy [or that] he hurts me . . . ."

In his closing argument, defense counsel argued that the "key evidence" in this case was "not consistent with a criminal act." He pointed to K.H.'s intoxication, her initial exaggeration of the extent of her injuries, her inconsistent statements, and the fact that a heavy door with metal brackets was prone to such accidents. He argued it was more likely that Wilson pushed the door closed, and was unaware that K.H.'s fingers were "barely inside the plane of the door." In summary, he argued: "[Wilson] did not have criminal intent. He did not have malicious intent, but he did want her out of the apartment." And, he argued, as the sole legal tenant of that apartment, he had "the sole legal right to live there."

## II. DISCUSSION

### A. Instructional Error Claims

Wilson argues that the trial court erred by refusing to instruct the jury on the defense of accident and by adding a pinpoint jury instruction for infliction of corporal

8

injury on a cohabitant. Wilson also argues that if the issues are considered forfeited, defense counsel was prejudicially ineffective for failing to object.

### 1. Accident Instruction

### a. Background

At the instructional conference, defense counsel requested that the trial court give an instruction on the defense of accident. At the outset, the court stated it was having "a hard time getting my mind around that. I understand that the argument is that the injury, that is, the mangled fingers was an accident. But that's not what the accident defense goes to. The accident defense goes to the act, not the result." Defense counsel responded: "Your Honor, it's worded, kind of, curiously, [CALCRIM No.] 3404. It says, 'The defendant is not guilty of the crime if he acted without the intent required for that crime, and instead acted accidentally.' " Defense counsel acknowledged that infliction of corporal injury on a cohabitant was a general intent crime, but noted that section 273.5 requires that a defendant "willfully inflicted a physical injury. That really is the intent. We have to prove that he willfully inflicted the injury, or purposefully inflicted the injury." Put another way, defense counsel argued it required a showing of "willful plus inflicted physical injury. So that's the intent, really. I mean, shutting the door, that's not the issue. The issue is, did he shut the door with the intent to inflict a physical injury, meaning, was there an awareness."

The trial court disagreed, stating "there doesn't have to be an intent to injure on a 273.5." The court continued: "So here's an example of a door being closed accidentally—because I know that you said last night in your e-mail that the defendant willfully closed the door at least once, or something to that effect. [¶] An accidental closing of the door would be, the defendant is running towards the door, trips, falls, and in falling, lands and closes the door on her hand. Not, I'm closing the door. Willful is that you're doing it purposely, or with deliberation. You're deliberately doing it. There's no requirement that the defendant willfully or intended to inflict an injury. It's just that

9

the act was intentional and not accidental. [¶] So I've been struggling with the accident defense for that very reason. So I think there's a lot of case law that discusses the fact that the accident defense goes to the intent, not the result."

Defense counsel responded: "Your Honor—well, look, I do understand that the language under the acts of instruction is a little confusing. And, frankly, I feel confident that I can successfully argue under the current existing jury instruction that we have without that instruction, because it is, kind of, confusing, seeing that the Court is leaning against it, anyway. So I'm okay with that."

### b. Standard of Review

"Penal Code section 26 states the statutory defense: 'All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Five— Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence.' The defense appears in CALCRIM No. 3404, which explains a defendant is not guilty of a charged crime if he or she acted 'without the intent required for that crime, but acted instead accidentally.' " (*People v. Anderson* (2011) 51 Cal.4th 989, 996 (*Anderson*).)

"A trial court must instruct the jury, even without a request, on all general principles of law that are ' "closely and openly connected to the facts and that are necessary for the jury's understanding of the case." [Citation.] In addition, "a defendant has a right to an instruction that pinpoints the theory of the defense . . . ." ' [Citation.] The court may, however, 'properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021.) "[A]ssertions of instructional error are reviewed de novo." (*People v. Shaw* (2002) 97 Cal.App.4th 833, 838 (*Shaw*).)

10

### c. The Trial Court Did Not Err by Declining to Give an Instruction on the Defense of Accident

Wilson argues that the trial court erred by not giving an accident instruction in response to defense counsel's request. The Attorney General contends that substantial evidence does not support an instruction on the defense of accident and that if there was error, it was invited.

" 'As a general rule, a statute proscribing willful behavior is a general intent offense. . . . The only intent required for a general intent offense is the purpose or willingness to do the act or omission.' " (*People v. Thurston* (1999) 71 Cal.App.4th 1050, 1053.) Accordingly, "section 273.5, subdivision (a) requires only the mens rea of intending to do the assaultive act." (*Id.* at p. 1055.) There is no requirement that a defendant intend to cause an injury. (*Id.* at p. 1054 [" 'The pivotal question is whether the defendant intended to commit an act likely to result in such physical force, not whether he or she intended a specific harm.' " (italics omitted)]; see also *People v. Burton* (2015) 243 Cal.App.4th 129, 134, fn. 8 [§ 273.5 does not require "the specific intent to injure. Rather, it requires a 'willful' act which results in injury and is thus a general intent crime."].)

Here, Wilson does not dispute he intentionally closed the door, but argues he did not know K.H.'s hand was in the door and did not intend to injure her. But as discussed, the intent required was not that he specifically intended to close the door on K.H.'s hand or otherwise cause a traumatic injury. Rather, what was required was that Wilson intended to commit an act likely to result in the application of physical force to K.H. And in that respect, the uncontroverted evidence was that Wilson forced K.H. out of the apartment and pushed the door closed while K.H. was near the door, such that it was reasonably foreseeable the door would hit K.H. and injure her. There was no evidence to the contrary. Because there was no evidence that Wilson did not intend to commit an

assaultive act, that is, an act likely to result in physical force, the trial court properly refused the requested accident instruction.[4]

Wilson relies on *People v. Gonzales* (1999) 74 Cal.App.4th 382 (*Gonzales*), disapproved on other grounds by *Anderson*, *supra*, 51 Cal.4th 989.[5] That reliance is misplaced. In *Gonzales*, the defendant was charged with infliction of corporal injury on a cohabitant after an alleged incident of intimate partner violence. (*Gonzales*, *supra*, at pp. 384-385.) In that case, the victim testified that the defendant woke her up and instructed her to make him something to eat. "When she refused, he poured water on her. She then poured water on him, and he punched her in the stomach several times." (*Id.* at p. 384.) The victim ran to the bathroom and locked the door. The defendant kicked the door open, causing the door to strike the victim. (*Id.* at pp. 384-385.) At the preliminary hearing, however, the victim testified that her injuries were caused by an accident: "that the door struck her as she was leaving the room and [the defendant] was entering it and that [the defendant] did not assault her." She also specifically denied the other allegations. (*Id.* at p. 384.)

On appeal, the defendant argued that the trial court erred by failing to instruct the jury sua sponte on the defense of accident. The Court of Appeal found: "The testimony of the defense witnesses and [the victim's] testimony that at the preliminary hearing she had testified that her injuries were caused accidentally when she was struck by the door as [the defendant] entered the bathroom constituted substantial evidence that her injuries were caused by an accident and that [the defendant] did not have the requisite intent to be

---

[4] Because we find no error, we do not address Wilson's argument that his attorney was ineffective or the Attorney General's argument that error was invited.

[5] *Anderson* disapproved *Gonzales*'s holding that a court has a sua sponte duty to instruct on the defense of accident in some instances, finding that the instruction must only be given on request. (*Anderson*, *supra*, 51 Cal.4th at pp. 997-998.) Wilson relies on *Gonzales* insofar as it discusses what constitutes substantial evidence to support an accident instruction.

guilty of willful infliction of corporal injury on a cohabitant or simple battery." (*Gonzales*, *supra*, 74 Cal.App.4th at p. 390.)

But the evidence supporting the accident instruction in *Gonzales* is markedly different than the evidence in this case. The victim in *Gonzales* stated during the preliminary hearing that the door struck her on accident as she was attempting to leave the bathroom and the defendant was attempting to enter it. In other words, the defendant allegedly did not know the victim was near the door. By contrast, the uncontroverted evidence in this case established that Wilson pushed K.H. through the doorway and then immediately slammed the door shut, all with the knowledge that K.H. was near the door. *Gonzales* is therefore inapposite to Wilson's case.

Even if we assume that the trial court erred by declining to give an accident instruction, any error was undoubtedly harmless. " '[W]rongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated in' in [*People v.*] *Watson* [(1956) 46 Cal.2d 818]." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 830.) Under *Watson*, we consider whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson*, *supra*, at p. 836 (*Watson*).) " 'In determining whether instructional error was harmless, [a] relevant inquir[y] [is] whether the "factual question posed by the omitted instruction necessarily was resolved adversely to the defendant under other, properly given instructions." ' " (*People v. Sojka* (2011) 196 Cal.App.4th 733, 738.) To say that an offense was an accident " ' "amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime." ' " (*Anderson*, *supra*, 51 Cal.4th at p. 997.)

Here, the jury was instructed that to prove the crime of corporal injury of a cohabitant, the prosecution had to prove, in relevant part, that Wilson "willfully and unlawfully inflicted a physical injury on his cohabitant or someone with whom he has or previously had an engagement or dating relationship." The court further instructed that

13

"[s]omeone commits an act willfully when he or she does it willingly or on purpose." "We presume the jury followed the instructions it was given." (*People v. Chism* (2014) 58 Cal.4th 1266, 1299.)

The evidence was strong that Wilson acted with the requisite criminal intent rather than on accident. K.H. made clear that Wilson forcefully pushed her out of the apartment and repeatedly slammed her fingers in the door at least three times. The severity of the injuries supported K.H.'s statements that Wilson repeatedly slammed the door on her hand. K.H. also made clear that she told Wilson her hand was in the door and she believed that he must have been aware of that fact. According to K.H., she yelled, " 'Please stop. You're hitting my hand.' And he just kept trying to close the door." While slamming K.H.'s hand, Wilson said to her that she "deserve[d] it" and told her, "Get away from me. Get away from me."

By contrast, the evidence supporting an accident defense was weak. Although K.H. eventually stated that Wilson "didn't realize" her hand was in the door, she went on to reiterate, "I was yelling, 'Please stop. You're hitting my hand.' And he just kept trying to close the door." When Rosario asked for clarification, "So, you're saying that he did not know that your hand was in a door . . . . until after he . . . hit you?" K.H. responded somewhat incongruently, "Well, he didn't come out to look." "I said, 'I need you to come out and look at this,' and he wouldn't." Later, Rosario asked K.H., "So, he pushed you?" K.H. replied, "Yeah, I just tried to get my things." "But, he wouldn't listen when I was saying, 'You're hurting me. You're hurting me. You're hurting me.' " She further elaborated, "It was an honest accident that is really tragic, but it's just if someone's screaming you have to stop." Thus, even though K.H. later said it was an accident, she nonetheless acknowledged and maintained that Wilson persisted in slamming the door on her hand despite her pleading for him to stop.

In light of the strong evidence that Wilson knew K.H.'s hand was in the door, the weak evidence it was an accident, and the instructions given to the jury that they could

14

find Wilson guilty only if he willfully and unlawfully inflicted a physical injury on his cohabitant, it is not reasonably probable that Wilson would have achieved a more favorable result had the jury been given an accident instruction. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

### 2. Challenge to Pinpoint Instruction

Wilson argues that the trial court erred by granting the prosecution's request for a pinpoint instruction. The Attorney General maintains that the instruction was an accurate statement of law and supported by substantial evidence, and thus properly given.

### a. Background

Before closing arguments, the trial court gave the jury a modified version of CALCRIM No. 840, which stated, in relevant part: "The defendant is charged in Count One with inflicting an injury on a cohabitant that resulted in a traumatic condition in violation of Penal Code section 273.5, sub-section A. To prove that the defendant is guilty of this crime, the People must prove that, (1), the defendant willfully and unlawfully inflicted a physical injury on his cohabitant, (2), the injury inflicted by the defendant resulted in a traumatic condition, and (3), the defendant did not act with reasonable force to make a trespasser leave defendant's home. [¶] *Someone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage.*" (Italics added.)

At an in limine hearing after the instructions were given, defense counsel objected to the italicized portion of the instruction: "The problem I'm having . . . is with the language that was added onto the pattern[] instruction, the language is not required." Defense counsel argued that section 273.5 required "proof or intent to injure," and therefore the pinpoint instruction was inappropriate. The court stated that its own research indicated "just the opposite," that section 273.5 did not require proof of an intent to injure. Defense counsel then stated, "I'm not arguing that there is" a need "to prove an intent to injure," but rather that the pinpoint instruction "tends to lower [the

15

prosecution's] burden and it tends to confuse [the jury]" because it contracts the first element of the offense, " '[t]he willful infliction of an injury.' "  In sum, defense counsel asked the court "to leave the pattern instructions the way they are and to not add that additional language [to] the 273.5 instruction . . . ."  The court declined to change the language:  "If I thought it was an incorrect statement of the law or somehow was confusing I would do so, but it's not an incorrect statement of the law.  I don't think it will be confusing.  I believe it actually clarifies the issues.  So the language will remain."

Later, the court stated it had done some additional research on the section 273.5 instruction, and decided to remove the language to which defense counsel had objected.  The court stated it felt some of the pinpoint language was potentially confusing.  However, the court also stated that it would nevertheless be appropriate to specify that the intent required was "not the specific intent to inflict traumatic injury."  Accordingly, the court stated that "if the People request a pinpoint instruction to specify that, I will give that pinpoint instruction.  Given the nature of the injury here and the offenses that are being asserted, that may make it more clear for the jury what exactly is required in the intent requirements under 273.5."  The prosecution then requested the pinpoint instruction.

The court proposed instructing the jury with the following pinpoint instruction:  "Someone commits an act willfully when he or she does it willingly or on purpose.  It is not required that the person have the specific intent to inflict a traumatic injury."  Although he acknowledged that "that's a correct statement of law," defense counsel objected "to that sentence being added, because it's modifying the pattern[] instruction."  After the jury was brought back in, the court gave the jury the modified instruction.

**b.  Standard of Review**

The trial court has a sua sponte duty to accurately instruct the jury on every material element of a criminal offense.  (*People v. Flood* (1998) 18 Cal.4th 470, 480-481.)  This duty includes the requirement to instruct the jury on all general principles

16

of law raised by the evidence.  (*People v*. *Rogers* (2006) 39 Cal.4th 826, 866.)  " ' "The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' "  (*People v*. *Breverman* (1998) 19 Cal.4th 142, 154.)

Pinpoint instructions " 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a [party]'s case.' "  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.)  Parties are entitled to legally correct and factually warranted pinpoint instructions should they request such additional instruction.  (*People v*. *Hughes* (2002) 27 Cal.4th 287, 362.)

"[A]ssertions of instructional error are reviewed de novo."  (*Shaw*, *supra*, 97 Cal.App.4th at p. 838.)  "In doing so, we must determine whether there was sufficient evidence to support the challenged instruction [citation], and whether the instructions delivered a correct statement of the law."  (*People v*. *Stinson* (2019) 31 Cal.App.5th 464, 476.)

### c.  The Trial Court Did Not Err Because the Pinpoint Instruction Was a Correct Statement of Law That Was Supported by Substantial Evidence

As we have discussed, because infliction of corporal injury on a cohabitant is a general intent crime, "section 273.5, subdivision (a) requires only the mens rea of intending to do the assaultive act."  (*Thurston*, *supra*, 71 Cal.App.4th at p. 1055.)  There is no requirement a defendant intends to cause an injury.  (*Id*. at pp. 1054-1055.)  "General criminal intent . . . requires no further mental state beyond willing commission of the act proscribed by law."  (*People v*. *Sargent* (1999) 19 Cal.4th 1206, 1215.)

In light of this, the trial court did not err in granting the prosecution's request to give a pinpoint instruction that "[s]omeone commits an act willfully when he or she does it willingly or on purpose.  It is not required that the person have the specific intent to inflict the traumatic injury."  The instruction was an accurate statement of law.  Moreover, the pinpoint instruction was also responsive to the evidence and arguments

17

adduced at trial. After claiming that Wilson intentionally slammed the door on her hand, K.H. later indicated to police that the injury was accidental. Defense counsel also argued that Wilson was not guilty of infliction of corporal injury because he did not intend to cause a traumatic injury. The pinpoint instruction properly focused the jury's attention on the fact that Wilson may be found guilty of the offense even if he did not intend to cause a traumatic injury. Because the pinpoint instruction was an accurate statement of the law and was supported by substantial evidence, the trial court did not err in granting the prosecution's request to give the instruction.

## B. Expert Testimony in Response to Hypothetical

Wilson contends that the trial court erred by allowing Ferry to give an opinion in response to a hypothetical question that tracked the prosecution's evidence in the case. He also contends that the testimony violated his federal constitutional rights because it "allowed the jury to convict [him] based on . . . improper expert opinion that effectively told the jury [K.H.] was a victim of domestic violence." We do not find error in the admission of this opinion evidence.

## 1. Background

During Ferry's direct examination, the prosecutor asked Ferry: "Now, I want to ask you some specific questions, some hypothetical questions. But before we go there, I want to ask you, have you read the police report related to this case?" Ferry responded, "No, I have not." Ferry also stated he had not met Wilson or K.H. The prosecutor continued: "So I want to ask you some hypothetical [questions]. Assume that a boyfriend and a girlfriend live together, and get into an argument. And the girlfriend tells the boyfriend that she wants to end the relationship. Assume that the girlfriend wants to leave the apartment because she wants to diffuse the situation since she sees that the boyfriend is getting more and more aggressive. Assume that the girlfriend tells the police later that she wanted to leave because she didn't want to be hit. Assume that the boyfriend initially did not want the girlfriend to leave the apartment. [¶] Assume that the

18

girlfriend tells the boyfriend that her friend is coming to pick her up so that she can get out of the apartment and they can have some time apart from each other. Assume that the boyfriend does not like that idea. Assume that after the argument continues, all of a sudden the boyfriend kicks the girlfriend out of the apartment. Assume that the boyfriend uses physical force to remove the girlfriend out of the apartment before she has a chance to get her belongings."

The prosecutor continued: "Assume that while the boyfriend is pushing the girlfriend out of the apartment, her hand gets caught in the door. Assume that the boyfriend closes the door to the apartment while the girlfriend's fingers are still in the doorway. Assume that after he did that, the victim yells for the boyfriend to stop and pleads for him to help her. [¶] Assume that the boyfriend does not help her, so the girlfriend calls 911 asking for medical help. Assume that the victim told the 911 dispatcher that the boyfriend smashed her hand at least three times with the door, and that he knew her hand was in the door, because she kept yelling for him to stop, and telling him that he was hurting her, and that her hand was there, but he would not stop. [¶] Assume that the girlfriend also told the police that, even though her boyfriend repeatedly smashed her fingers after she told him to stop, that she thinks this was all a tragic accident and that he did not intent to hurt her that badly. Assume that the girlfriend also told the medical professionals that treated her for her injuries that the boyfriend smashed her fingers multiple times. [¶] Assume that two [of] the girlfriend's fingers were fractured, and that one of her nails immediately came off during this incident. Assume that the girlfriend did not want the boyfriend to go to jail and refused to get a restraining order. Assume that the girlfriend and boyfriend are still together, and that the girlfriend refuses to testify."

The prosecutor then asked, "Would you say that these facts are consistent with someone in a relationship involving intimate partner violence?" Defense counsel objected, contending, "This is an incomplete hypothetical. These are also allegedly the

19

facts of this case. It's improper for this expert witness to testify regarding the ultimate issues in this particular case." The trial court overruled the objection.

Ferry answered, stating, "Is it consistent with common experiences of intimate partner violence? Yes, it could be." After being asked the basis of his opinion, Ferry stated, "Well, the broad answer to that, 35 years working in the field, reading thousands of pages of professional literature dealing with hundreds of clients. Specifically, there are features in the hypothetical that you asked me to assume that . . . commonly occur in these cases, in domestic violence cases. The changing of the story . . . within a short time to the 911, to the police, and then later to the medical personnel. It doesn't tell us what really happened, but the changing of a story is not uncommon." Ferry continued: "The . . . stated desire to save the boyfriend from going to jail is very common. But, again, that doesn't tell us what really happened. It is very common, the victims don't want their partners to go to jail."

## 2. Standard of Review

" 'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id*., § 801).' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*).) " 'Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' " (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944.) In particular, "expert testimony about the behavior of domestic violence victims is admissible" (*People v. Brown* (2004) 33 Cal.4th 892, 895) to "assist the trier of fact in evaluating the credibility of the victim's trial testimony and earlier statements to the police, by providing relevant information about the tendency of victims of domestic violence later to recant or minimize their description of that violence." (*Id*. at pp. 895-896.)

20

**3. The Trial Court Did Not Abuse Its Discretion by Allowing the Expert to Render an Opinion about the Hypothetical Posed**

In *Vang*, *supra*, 52 Cal.4th 1038, four defendants were convicted of assault by means of force likely to produce great bodily injury with a gang enhancement. (*Id.* at p. 1041.) At trial, the prosecutor's gang expert, using hypothetical facts based on the case, opined that the attack was gang-motivated based on the assumed facts in the hypothetical. (*Id.* at pp. 1042-1043.) On appeal, the defendants challenged the expert's testimony in response to the hypothetical question. (*Id.* at p. 1044.) "The Court of Appeal held that the trial court erred in permitting the expert to respond to hypothetical questions the prosecutor asked because the questions closely tracked the evidence in a manner that was only thinly disguised." (*Id.* at p. 1041.)

Following a petition for review, our high court disagreed and found the testimony in response to the hypothetical permissible. It held that an expert can "express an opinion, based on hypothetical questions that tracked the evidence, whether the [crime], if the jury found it in fact occurred, would have been for a gang purpose." (*Vang*, *supra*, 52 Cal.4th at p. 1048.) The court explained that the use of "hypothetical questions is subject to an important requirement." (*Id.* at p. 1045.) Namely, " '[s]uch a hypothetical question must be rooted in facts shown by the evidence . . . .' " (*Ibid.*) This is so because "[a] hypothetical question not based on the evidence is irrelevant and of no help to the jury." (*Id.* at p. 1046.) "Expert testimony not based on the evidence will not assist the trier of fact. Thus, '[a]lthough the field of permissible hypothetical questions is broad, a party cannot use this method of questioning a witness to place before the jury facts divorced from the actual evidence and for which no evidence is ever introduced.' " (*Ibid.*)

In this case, as in *Vang*, Ferry expressed an opinion based on hypothetical facts that appropriately tracked the evidence. It was not "improper" to do so, as Wilson argues, but rather it was *required* that the hypothetical questions be rooted in facts shown

21

by the evidence. (*Vang*, *supra*, 52 Cal.4th at p. 1046.) The relevance of the evidence was premised on the close relationship between the hypothetical facts and the facts in evidence. Wilson attempts to distinguish *Vang* by arguing that "*Vang* dealt with a gang expert, not an abuse expert," and that a different rule for hypotheticals applies in abuse cases. We disagree. The reasoning in *Vang* was based on general principles governing expert testimony in the Evidence Code and under what circumstances a hypothetical question may be posed to such experts. (See *Vang*, *supra*, 52 Cal.4th at p. 1044 [discussing Evid. Code, § 801].) Nothing in the analysis limits the case to gang experts. Thus, we follow our high court's decision in *Vang*.

Nor did Ferry's testimony in response to the hypothetical impermissibly tell the jury that K.H. was a victim of intimate partner violence or that Wilson was guilty of the offense. Rather, Ferry answered the hypothetical by stating, "Is it consistent with common experiences of intimate partner violence? *Yes*, *it could be*." (Italics added.) Ferry also stated that "[t]he changing of the story" in the hypothetical question was "not uncommon," but it "*doesn't tell us what really happened*." (Italics added.) Finally, Ferry explained that the "stated desire to save the boyfriend from going to jail" "*again . . . doesn't tell us what really happened*." (Italics added.) Accordingly, in his answers, Ferry did not express an opinion about whether K.H.'s accusations were credible or whether intimate partner abuse had actually occurred. Thus, Wilson's claim that the testimony was improper is unavailing.

## C. Cumulative Error

Wilson contends that the cumulative impact of the instructional errors and admission of the expert witness testimony rendered his trial unfair. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

In this case, we have rejected all of Wilson's previous claims of error. As there are no errors to cumulate, we must also reject his claim of cumulative error.

### III.  DISPOSITION

The judgment is affirmed.

_____
                         Wilson, J.

WE CONCUR:

_____
    Bamattre-Manoukian, Acting P.J.

_____
             Danner, J.

People v. Wilson
H047235